**Ernest JOHNSON, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. SC 90582.**

Supreme Court of Missouri,
En Banc.

March 1, 2011.

Rehearing Denied March 29, 2011.

William J. Swift, Public Defender's Office, Columbia, for Johnson.

Evan J. Buchheim, Shaun J. Mackelprang, Attorney General's Office, Jefferson City, for the State.

ZEL M. FISCHER, Judge.

This is an appeal from a Boone County circuit court judgment overruling Ernest Johnson's Rule 29.15 motion for post-conviction relief. This Court previously affirmed Johnson's 1995 guilty verdicts on three counts of first degree murder, but the three death sentences recommended by the jury and imposed by the circuit court were set aside on direct appeal, and the case was remanded for a new penalty-phase proceeding. *See State v. Johnson*, 968 S.W.2d 686 (Mo. banc 1998) (*Johnson I*). Following a second penalty-phase proceeding, the new jury returned three death sentences, and the circuit court sentenced Johnson to death. This Court affirmed the sentence of death on direct appeal in *State v. Johnson*, 22 S.W.3d 183 (Mo. banc 2000) (*Johnson II*). Those death sentences were later set aside by this Court during Johnson's second post-conviction appeal, and the case was remanded for a third penalty-phase proceeding because of incomplete evidence of his mental capacity, specifically, his alleged mental retardation. *See Johnson v. State*, 102 S.W.3d 535, 537 (Mo. banc 2003) (*Johnson III*). Following the third penalty-phase proceeding, the jury found that Johnson was not mentally retarded, and three death sentences were again imposed. Johnson appealed, and this Court affirmed the sentence of death on direct appeal. *See State v. Johnson*, 244 S.W.3d 144 (Mo. banc 2008) (*Johnson IV*).

Johnson then filed a Rule 29.15 *pro se* motion for post-conviction relief, and appointed counsel later filed an amended motion. An evidentiary hearing was held, and the motion court received testimony from three mental-health professionals, from Johnson's third penalty-phase attorneys, and from several other witnesses relating to guilt-phase testimony. The motion court entered findings and a judgment overruling Johnson's motion. Because death was imposed, this Court has exclusive jurisdiction over this appeal. Mo. Const. art. V, sec. 10; order of June 16, 1988.

### Facts

This is the fifth time Ernest Lee Johnson has been before this Court. Johnson was convicted for the 1994 murders of three employees of a Casey's convenience store in Columbia. The victims were bludgeoned, stabbed, and shot. The details of the crimes are set forth in *Johnson I*, 968 S.W.2d at 689–90.

Johnson's third penalty-phase proceeding was held in Boone County circuit court in May 2006. The State presented evidence from police officers, the medical examiner, and other witnesses regarding the circumstances of the crime and presented testimony from family members of the victims. The State also presented a recorded interview between Johnson and a psychiatrist, Dr. Heisler, who evaluated Johnson for mental retardation in 2004.

Johnson called his brother and sister to testify, as well as former teachers, probation officers, an ex-girlfriend, and an ex-cellmate. He also called a psychiatrist, Dr. Parwatikar, and a psychologist, Dr.

Smith, to testify about the effects his alleged cocaine use may have had on him at the time of the murders. Dr. Smith also testified that recent testing showed Johnson is mentally retarded, that Johnson's mother abused drugs and alcohol while she was pregnant with him, and that Johnson's condition suggests fetal alcohol syndrome. Johnson also presented testimony from Dr. Keyes, who testified that Johnson is mentally retarded.

The parties entered a stipulation before the jury that Johnson was the only person, other than the victims, who was in the store on the night of the murders. The jury found that Johnson had not proven by a preponderance of the evidence that he was mentally retarded. It also found beyond a reasonable doubt the existence of six statutory aggravating circumstances: (1) each murder was committed while murdering another victim; (2) each murder was committed while murdering yet another victim; (3) each victim was murdered for the purpose of receiving money; (4) each murder involved depravity of mind and was outrageously and wantonly vile, horrible, and inhuman; (5) each murder was committed to prevent defendant's arrest; and (6) each murder was committed while defendant was engaged in a robbery. Like the previous two juries that heard Johnson's case, the jury in Johnson's third penalty-phase proceeding recommended three death sentences, which the trial court later imposed.

Johnson filed a Rule 29.15 motion for post-conviction relief. An evidentiary hearing was held on the motion, and the motion court received testimony from three mental-health professionals specializing in fetal alcohol spectrum disorder, from Johnson's third penalty-phase attorneys, and from several other witnesses relating to guilt-phase testimony. The motion court entered findings and a judgment overruling Johnson's motion.

## Standard of Review

This is an appeal from the motion court's judgment overruling Johnson's post-conviction motion. This Court reviews Johnson's claims for the limited purpose of determining whether the motion court clearly erred in making its findings of fact and conclusions of law. *Skillicorn v. State*, 22 S.W.3d 678, 681 (Mo. banc 2000); Rule 29.15(k). "In order to prove that his counsel was ineffective, a movant must show that counsel's performance 'did not conform to the degree of skill, care, and diligence of a reasonably competent attorney' and that movant was thereby prejudiced." *Id.* (citing *State v. Hall*, 982 S.W.2d 675, 680 (Mo. banc 1998)). "To demonstrate prejudice, a movant must show that, but for counsel's poor performance, there is a reasonable probability that the outcome of the court proceeding would have been different." *Id.* "This Court presumes that counsel acted professionally in making decisions and that any challenged action was a part of counsel's sound trial strategy." *Id.* at 681–82.

## Analysis

Johnson raises six points on appeal.

### I. Dr. Keyes's Testimony

Johnson argues the motion court erred in overruling his post-conviction motion because he received ineffective assistance of counsel in that effective counsel would not have called Dr. Keyes, but instead would have called a qualified, neutral fetal alcohol syndrome diagnostic expert. Johnson claims counsel called Dr. Keyes knowing that he was an unprepared, unqualified, and incredible witness and knowing that he was an advocate for the mentally retarded rather than an objective clinician.

"Generally, the selection of witnesses and the introduction of evidence are

questions of trial strategy and virtually unchallengeable." *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997). "[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony." *Id.* at 268.

Johnson contends that trial counsel should have known that Dr. Keyes was an incredible witness because this Court rejected Dr. Keyes's testimony about mental retardation in another case, *Goodwin v. State*, 191 S.W.3d 20, 32 (Mo. banc 2006). In *Goodwin*, Dr. Keyes was called as a defense witness during a hearing on Goodwin's claims for post-conviction relief. 191 S.W.3d at 32. On appeal from the overruling of his Rule 29.15 motion, this Court held that Dr. Keyes's testimony that Goodwin was mentally retarded was insufficient to support a holding that the motion court clearly erred in finding Goodwin was not mentally retarded. *Id.* This Court pointed to three bases for this holding. *Id.* First, his testimony resulted from a diagnosis of Goodwin when he was 34 years old, but § 565.030.6, RSMo Supp.2006[1] requires that mental retardation be "manifested and documented" by age 18 years. *Id.* Second, Dr. Keyes's testimony lacked the necessary evidentiary support because the basis of his testimony was litigation materials chosen by defense counsel, not objective evidence. *Id.* Third, Dr. Keyes's testing was found to be unreliable because he was not trained to evaluate the IQ of a hearing-impaired individual, like Goodwin, and he failed to test for malingering or depression, which was below professional standards. *Id.* at 33.

This Court did not hold in *Goodwin* that Dr. Keyes is *per se* an incredible or unreliable witness. On the facts of that case, Dr. Keyes's testimony did not have the evidentiary support or reliability necessary to warrant relief. Here, arguably Dr. Keyes's testimony was based on objective factors, unlike his testimony in *Goodwin*. Dr. Keyes, who holds a Ph.D. in special education, evaluated Johnson. Based on Dr. Keyes's finding that Johnson was mentally retarded, Dr. Smith, who had previously evaluated Johnson in 1996 and 1999 and found he was not mentally retarded, changed his opinion. *See Johnson IV*, 244 S.W.3d at 156. Dr. Keyes's work was cited by the United States Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 316 n. 20, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Even though there were issues of credibility related to Dr. Keyes, *see Johnson IV*, 244 S.W.3d at 156, the decision to call him was reasonable trial strategy. *Kenley*, 952 S.W.2d at 266.

Significantly, the jury did not hear about the *Goodwin* opinion. Six days after the *Goodwin* opinion was issued, defense counsel moved for a continuance after jury selection on the ground that in *Goodwin*, Dr. Keyes's testimony had not been found to be credible evidence of Goodwin's mental retardation. The prosecutor agreed that he would not cross-examine Dr. Keyes regarding the *Goodwin* opinion, and the court overruled the continuance motion. The court noted that this Court's decision in *Goodwin* was based on the particular facts elicited in that case and not on the background that would be provided in Johnson's case.

Johnson attempts to prove counsel should have known Dr. Keyes was historically unprepared even without the *Goodwin* opinion by citing to his trial testimony, in which Dr. Keyes misspoke and had to correct himself. In each instance, Dr. Keyes, either on his own or with the assistance of counsel, corrected his misstatements. These minor misstatements do not

---

1. This is the statute in effect at the time *Goodwin* was decided. The language in § 565.030.6, RSMo Supp.2006, and § 565.030.6, RSMo Supp.2009, is the same. All other references to § 565.030.6 are to RSMo Supp.2009.

show that Dr. Keyes was an unqualified or unprepared witness, let alone prove that counsel were ineffective because they should have known Dr. Keyes was unprepared.

Johnson also points to the fact that counsel sought a continuance because Dr. Keyes needed additional time to review Dr. Heisler's report and because Dr. Keyes refused to disrupt his teaching schedule to testify at trial. Johnson relies on *Skaggs v. Parker*, 235 F.3d 261, 264, 267 (6th Cir.2000), and *Stevens v. McBride*, 489 F.3d 883, 888 (7th Cir.2007). In *Skaggs*, counsel called a witness who fraudulently held himself out as a psychologist. 235 F.3d at 267. Counsel was generally familiar with the expert witness and had used him in prior trials; therefore, the court held that counsel's failure to conduct a full-blown investigation into his academic credentials was not ineffective. *Id.* at 268. However, the court held that counsel's decision to call this witness at the penalty phase, despite the witness's "bizarre and eccentric" testimony that "made a mockery of the first trial," was below an objective standard of reasonableness. *Id.* at 269–70.

The facts of this case are distinguishable from *Skaggs*. Here, defense counsel investigated Dr. Keyes and knew about his academic background. Although Dr. Keyes needed additional time to prepare, and defense counsel expressed frustration at Dr. Keyes's delay, there is no evidence that Dr. Keyes provided testimony in the past that would have indicated to counsel that calling him would be harmful to Johnson. In *Skaggs*, counsel was aware the expert's testimony may harm the defendant but called him anyway because they believed it was not worth the additional time to request additional money from the court to hire another expert. *Id.* at 270. This is not the case here. Dr. Keyes's delay and scheduling conflicts do not indicate that he was unprepared or unreliable.

In *Stevens v. McBride*, 489 F.3d at 891–92, the court found it was unreasonable for defense counsel to rely on an expert who disregarded counsel's instructions not to prepare a report on the defendant, who prepared a report favorable to the prosecution, and who subscribed to a theory known as the "myth of mental illness." Counsel was aware that the expert favored the prosecution and viewed mental disorders as a "myth" yet called him anyway. *Id.* Here, the opposite is true—Dr. Keyes was favorable to the defense and did not question the science behind diagnosing mental retardation.

■ Johnson also suggests counsel were ineffective for failing to call qualified witnesses such as those who testified at the Rule 29.15 hearing. Johnson relies on *Hutchison v. State*, 150 S.W.3d 292, 308 (Mo. banc 2004), in which this Court found trial counsel were ineffective for failing to investigate the defendant's "medical, educational, family, and social history" and failing to present available evidence about the defendant's emotional and intellectual impairment, thereby depriving the jury of significant mitigating evidence. *Id.* Like Johnson, the defendant in *Hutchison* argued that counsel should have pursued and presented experts similar to those who testified at his motion hearing. *Id.* at 307. This Court did not hold that failure to call similar experts constituted ineffective assistance, but rather considered counsel's failure to adequately investigate the defendant's background and follow up on the information in their expert's report. *Id.* at 308. Counsel in *Hutchison* did not attempt to find the psychiatrist who treated the defendant when he was a teen, find the defendant's hospital or school records, or investigate the defendant's childhood physical and sexual abuse, even though this information was made known to counsel before trial. *Id.* at 305.

Here, Johnson's counsel called two experts, Dr. Keyes and Dr. Smith, who testified that Johnson was mentally retarded. Dr. Smith testified that Johnson's mother abused drugs and alcohol while she was pregnant with him and that Johnson's condition suggested fetal alcohol syndrome. Dr. Smith went into detail about where Johnson fell on the spectrum of fetal alcohol disorders, noting how his facial features suggest fetal alcohol syndrome, how his adolescent behavior was characteristic of the syndrome, and stating "all the data that's currently available would indicate that [Johnson's] characteristics and the test data suggest fetal alcohol syndrome." Expert testimony regarding fetal alcohol syndrome would have been cumulative to Dr. Smith's testimony.

Moreover, under § 565.030.6[2], mental retardation, not fetal alcohol syndrome, is a disqualifying factor, and the focus of Johnson's third penalty phase was his mental retardation. Dr. Smith and Dr. Keyes testified about Johnson's adaptive behaviors as defined in this statute. A finding that Johnson was mentally retarded would have precluded a death sentence, whereas a finding that he suffers from fetal alcohol syndrome may have mitigated his punishment. Failure to present expert testimony specifically related to fetal alcohol syndrome was not ineffective assistance.

Finally, Johnson suggests that calling Dr. Keyes even though counsel were aware he was an advocate for the mentally retarded was unreasonable. As noted, the decision to call an expert witness is a question of trial strategy. Johnson does not cite any cases that hold calling an expert who is an advocate for people similarly situated to the defendant is unreasonable. Again, it is clear that the decision to call Dr. Keyes was reasonable trial strategy.

## II. Evidence that Rod Grant Orchestrated the Offense

■ Johnson argues that the motion court clearly erred in overruling his post-conviction motion because his counsel were ineffective in that counsel should have presented evidence that Rod Grant orchestrated the crime and that Johnson was acting under the substantial domination of Grant. Johnson claims that evidence Grant had planned and participated in the crime would have refuted the State's argument that Johnson was the sole actor, was capable of committing the offense alone, and was not, therefore, mentally retarded.

Johnson alleges that certain guilt-phase evidence should have been adduced during the penalty phase of trial. Specifically, he claims that counsel should have called Officer Kevin McDonald, Officer Thomas Buel, Officer Kenneth McMillen, Officer Cary Maloney, Michael Maise, David Hopkins, and Bill Muddiman.[3]

---

**2.** Section 565.030.6 states:

> As used in this section, the terms "mental retardation" or "mentally retarded" refer to a condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which

conditions are manifested and documented before eighteen years of age.

**3.** Officer McDonald testified during the guilt phase and at the third post-conviction hearing that a teenager, LaFonzo Tucker, showed him where Grant had asked him to hide a shotgun. Thomas Buel testified that bloody marks left on shotgun shells recovered from a nearby park contained similar marks as those on the hammer recovered at Casey's and that this pattern was consistent with bloody gloves found in a field near Casey's.

Defense counsel testified at the post-conviction hearing that the penalty phase focused on mental retardation and a strategic decision was made to focus on that aspect of the case and not to go into the facts adduced at the guilt phase of trial. The motion court concluded that counsel's strategy of avoiding guilt-phase evidence was reasonable, that none of the proposed testimony would have supported the statutory mitigator that Johnson was acting under the substantial domination of another person, and that no reasonable probability existed that the presentation of this evidence would have changed the outcome of Johnson's third penalty-phase proceeding.

 The motion court did not clearly err in rejecting the claim of ineffective assistance of trial counsel. Ineffective assistance of counsel will not lie when the conduct "involves the attorney's use or reasonable discretion in a matter of trial strategy." *State v. Heslop,* 842 S.W.2d 72, 77 (Mo. banc 1992). "It is only the exceptional case where a court will hold a strategic choice unsound." *Id.* "Where trial counsel decides as a matter of trial strategy to pursue one evidentiary course to the exclusion of another, trial counsel's informed, strategic decisions not to offer certain evidence is not ineffective assistance." *State v. Simmons,* 944 S.W.2d 165, 181 (Mo. banc 1997).

Here, Johnson's counsel made a strategic decision to avoid rehashing guilt-phase testimony when the focus of the third penalty phase was Johnson's mental retardation, not his guilt. Furthermore, this evidence would not have shown that Johnson was acting under the substantial domination of Grant. At most, it would have shown that Grant was at Casey's on the night of the murder. Significantly, counsel entered a stipulation at the beginning of the third penalty phase trial that Johnson and the three victims were the only people in Casey's on the night of the murder. Counsel was not ineffective for failing to call these witnesses.

### III. Dr. Bernard's Deposition and Johnson's Mother's Mental Health Records

 Johnson alleges that trial counsel were ineffective for failing to offer into evidence the deposition of Dr. Carol Bernard, who evaluated Johnson for the first

---

Officer Kenneth McMillen testified at the third post-conviction hearing that he interviewed Johnson, who denied shooting anyone and said "one man wasn't strong enough to do that job." Officer McMillen testified during the original trial that while he was taking Johnson to the booking room, Johnson saw Grant in a holding cell and said to McMillen, "that boy didn't have anything to do with this."

Officer Cary Maloney testified during the third post-conviction hearing that he worked at the highway patrol laboratory, that DNA testing on the brown jacket allegedly worn by Johnson revealed a mixture of blood from all three victims, that testing on bloody gloves revealed a combination of blood from two of the victims, and that Johnson's blood did not appear on either the coat or gloves.

Michael Maise was a jailhouse confidant of Rod Grant, and he claimed that Grant told him he went to Casey's with Johnson to "make sure Ernest did what Ernest was supposed to do." Maise died before the evidentiary hearing in this case was held, and counsel offered into evidence a copy of the transcript pages from his testimony in Johnson's first trial.

David Hopkins testified at the first trial that he saw a tall man at Casey's around 10:30 on the night of the murder and that a few minutes later he saw a shorter man running toward Casey's. Hopkins knew Grant from school and said that he could not identify the shorter man, but if it had been Grant, he probably would have known it.

Finally, Bill Muddiman testified at the first trial that he saw "one or two" people looking into the front door of Casey's around midnight on the night of the murders.

post-conviction hearing, and for failing to offer the Mid–Missouri Mental Health records of Johnson's mother. The motion court found that Johnson failed to establish that counsel's actions were not pursuant to reasonable trial strategy. The motion court also found that Johnson did not claim that Dr. Bernard's deposition should have been read to the jury in lieu of her live testimony, that she was unavailable, or that she should have been called to testify. The court noted that because Johnson claimed that the deposition was admissible because it was relied on by his testifying experts, the jury could not use this testimony for its truth and, therefore, it would not have been admitted to show Johnson was mentally retarded.[4]

Johnson argues that the deposition was admissible under *Hutchison*, 150 S.W.3d 292. In *Hutchison*, this Court held trial counsel were ineffective for failing to follow up on information in their expert's report, failing to investigate the defendant's medical, educational, family, and social history, and for failing to present the available evidence about his emotional and intellectual impairment. *Id.* at 308. Due to these failures, the jury did not hear significant mitigating evidence, including evidence that the defendant had a low IQ and learning disabilities, he was in special education classes in school, his mother smoked marijuana with him when he was a young child, he used alcohol and drugs, his family had a history of alcoholism and mental illness, and he was physically and sexually abused as a child. *Id.* at 306.

Here, Dr. Bernard's deposition did not provide any new or mitigating evidence. While Johnson claims that Dr. Bernard's deposition would have refuted the prosecutor's argument that Johnson is not mentally retarded, Dr. Keyes and Dr. Smith already refuted this. In fact, Dr. Bernard's deposition would have been cumulative of Dr. Keyes's and Dr. Smith's testimony. Therefore, Johnson was not prejudiced by trial counsel's failure to admit the deposition into evidence.

■ Johnson also claims that counsel were ineffective for failing to offer his mother's mental health records into evidence. The motion court rejected this claim on the grounds that the jury was already aware of Johnson's mother's alcohol use through other testimony, that the records were inadmissible hearsay, that the evidence was cumulative to what already had been admitted, and that no reasonable probability existed that the result would have been different had the records been admitted.

Johnson's mother's mental health records were cumulative of evidence already admitted, and Johnson was not prejudiced by failure to admit these records. Dr. Smith testified about Johnson's mother's alcohol use during pregnancy, and the jury heard evidence that Johnson's half brother was profoundly mentally retarded and had been institutionalized. The jury also heard testimony from Johnson's brother and sister, who were clearly not mentally retarded. The jury had a clear picture of Johnson's family history; therefore, he

---

4. It is not necessary to address the State's claim that this evidence is inadmissible hearsay. In his original post-conviction motion, Johnson claimed Dr. Bernard's deposition, among other documents, should have been "admitted as part of the presentation of the experts [sic] testimony because they help the jury understand the expert's testimony." Therefore, Johnson argued the jury was entitled to review the evidence on which the expert witnesses relied in forming their opinions, not that Dr. Bernard's deposition was independently admissible as evidence of his mental retardation. On appeal, Johnson relies on *Hutchison*, 150 S.W.3d 292, in arguing the deposition was admissible, as discussed above.

was not prejudiced by the failure to admit these records.

## IV. Failure to Object to Dr. Heisler's Videotaped Evaluation of Johnson

■ Johnson contends that counsel were ineffective for failing to move to exclude portions of the recorded interview of Johnson by Dr. Heisler on the ground that Johnson was not advised of his Miranda[5] rights and was improperly questioned about the commission of the offense.

During Johnson's third penalty-phase proceeding, the State filed a pretrial motion asking the trial court to order Johnson to submit to a mental examination to be conducted by Dr. Gerald Heisler. Following a hearing and stipulation by the parties, the court ordered Johnson to submit to a mental examination for the purpose of assessing whether he is mentally retarded as that term is defined by § 565.030.6, RSMo Supp.2003.[6] Defense counsel testified during the post-conviction hearing that she did not object to the video of the Heisler interview because she believed it showed that Johnson was mentally retarded and because part of the stipulation concerning the interview was that it be videotaped. The motion court rejected Johnson's claim on the ground that counsel had a reasonable trial strategy for not objecting to the recorded interview because counsel believed it supported the defense and because a motion to suppress would have been meritless because Johnson placed his mental condition in issue.

It was reasonable strategy for trial counsel not to object to the Heisler video's admission into evidence. *See Kenley,* 952 S.W.2d at 266. During closing argument, defense counsel referred to the interview in support of the claim Johnson is mentally retarded, telling jurors that they had the benefit of seeing Johnson interviewed, and

noting how during the interview he could not perform a simple magic trick or remember who the president before Clinton was.

Moreover, any objection counsel may have raised to the interview on the ground that Johnson had not waived his right against self-incrimination is meritless because Johnson placed his mental condition into issue by claiming he is mentally retarded. Once Johnson put his mental condition in issue, he waived any claim that the testimony by Dr. Heisler or other experts who examined him violated his privilege against self-incrimination. *See State v. Copeland,* 928 S.W.2d 828, 839 (Mo. banc 1996), *overruled on other grounds by Joy v. Morrison,* 254 S.W.3d 885 (Mo. banc 2008); *State v. Thompson,* 985 S.W.2d 779, 786 (Mo. banc 1999) ("once a defendant places his mental condition at issue, he waives any claim that information or testimony from experts violates his privilege against self-incrimination.").

Johnson relies on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), but that case is inapposite. In *Estelle,* the defendant did not put his competency in issue, defendant's counsel was not notified about the scope of the examination, and it was unclear whether counsel was even informed that a doctor had been appointed to determine defendant's competency to stand trial. 451 U.S. at 470–71 and n. 15, 101 S.Ct. 1866. This Court in *Copeland* distinguished *Estelle,* stating:

> [*Estelle* ] stands for the proposition that a "criminal defendant who neither initiates a psychiatric evaluation *nor attempts to introduce any psychiatric evidence* may not be compelled to respond to a psychiatrist if his statements can be

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** This is the statute that was in effect at the time of the order.

used against him at a capital sentencing proceeding."

*Copeland,* 928 S.W.2d at 839 (quoting *Estelle,* 451 U.S. at 468, 101 S.Ct. 1866) (emphasis added). Like the defendant in *Copeland,* who attempted to introduce evidence regarding her status as a victim of battered-wife syndrome, Johnson attempted to introduce evidence regarding his alleged mental retardation.[7] The trial court did not clearly err in finding trial counsel were not ineffective for failing to object to portions of Dr. Heisler's interview being shown to the jury.

### V. Use of Dr. Kline's Testimony in Violation of § 552.020.14

Johnson argues the motion court erred in overruling his post-conviction motion because trial counsel were ineffective in failing to object to the prosecutor's use of statements by Dr. Kline, who evaluated whether Johnson was competent to proceed to trial. Johnson contends he was prejudiced because the jury was predisposed to conclude he was not mentally retarded based on references to Dr. Kline's opinion that Johnson is not mentally retarded. The motion court rejected his claim on the grounds that the defense witnesses Dr. Smith and Dr. Keyes had testified that they were provided with Dr. Kline's report when they evaluated Johnson, that the prosecutor did not ask anything about Dr. Kline's opinion of whether Johnson was competent to proceed with trial, and that the State was entitled to ask defense experts about the information on which they relied in forming their opinions.

Before Johnson's third penalty-phase proceeding began, defense counsel filed a motion for a mental examination of Johnson to determine whether he was competent to stand trial. This competency evaluation was ordered by the court and performed by Dr. Jeffrey Kline. During the third penalty phase, Dr. Parwatikar was asked, without objection, whether he had seen Dr. Kline's report, and Dr. Parwatikar replied that he had. During both direct and cross-examination of defense expert Dr. Smith, he testified that he had reviewed Dr. Kline's report as part of his evaluation of Johnson. Dr. Smith agreed that Dr. Kline had not found Johnson to be mentally retarded. Dr. Keyes also testified that he had reviewed Dr. Kline's report as part of his evaluation. On cross-examination, Dr. Keyes agreed that Dr. Kline stated Johnson was not mentally retarded.

Johnson claims the references to Dr. Kline's evaluation violate § 552.020.14, RSMo 2000, which provides:

> No statement made by the accused in the course of any examination or treatment pursuant to this section and no information received by any examiner or other person in the course thereof, whether such examination or treatment was made with or without the consent of the accused or upon his motion or upon that of others, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding then or thereafter pending in any court, state or federal. A finding by the court that

---

**7.** The other Supreme Court case on which Johnson relies is also distinguishable. In *Buchanan v. Kentucky,* 483 U.S. 402, 422–23, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), both the State and defense counsel joined in a motion for a doctor's examination pursuant to Kentucky's procedure for involuntary hospitalization. The State introduced the doctor's examination for the limited purpose of rebut-

ting the testimony of defendant's sole witness, who testified to establish the mental status defense of "extreme emotional disturbance." *Id.* The Supreme Court held that if a defendant requests a psychiatric evaluation or presents psychiatric evidence, then at the very least the prosecution can rebut this evidence with the reports from the examination the defendant requested. *Id.*

the accused is mentally fit to proceed shall in no way prejudice the accused in a defense to the crime charged on the ground that at the time thereof he was afflicted with a mental disease or defect excluding responsibility, nor shall such finding by the court be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.

The questions about Dr. Kline's findings do not violate § 552.020.14 because they did not seek to elicit information about any statements made by Johnson or information received by Dr. Kline. Instead, the questions were directed toward the opinion of Dr. Kline on the issue of Johnson's mental retardation. Even if the questions sought the prohibited information under § 552.020.14, the testimony adduced was not admitted in evidence on the issue of guilt. Therefore, the questions relating to Dr. Kline did not violate § 552.020.14.

In *Copeland,* a psychiatrist performed a competency evaluation of the defendant pursuant to § 552.020. 928 S.W.2d at 838. During the penalty-phase proceeding, the defendant presented evidence that she suffered from battered-spouse syndrome; in response, the State called as a witness the psychiatrist who performed the defendant's competency evaluation to testify that the defendant was not a battered spouse. *Id.* The defendant claimed on appeal that counsel was ineffective for failing to timely and properly object to the psychiatrist's testimony on the ground that it was inadmissible under § 552.020.12 (now § 552.020.14). This Court held that the defendant's guilt had already been established when the psychiatrist's testimony was presented and the statute in question "only prohibits admission of the examiner's testimony on the issue of guilt." *Id.* at 839. *Copeland* is analogous; therefore, the motion court did not clearly err in rejecting Johnson's claim of ineffective assistance for failure to object to questions about Dr. Kline's evaluation.

## VI. Geographic Disproportion

■ Johnson argues that the motion court clearly erred in denying his claim that the death penalty in Boone County is imposed arbitrarily and capriciously. He contends the decision whether to seek death reflects a "geographic lottery" because Boone County prosecutors seek the death penalty in more cases than prosecutors in other counties. In his post-conviction motion, Johnson made a different argument, claiming the death penalty is "randomly inflicted" in Missouri because there are no statutory guidelines or judicial decisions to help narrow the number of cases that are eligible for the death penalty; therefore, the decision of who receives death is based solely on prosecutorial discretion. Johnson made no argument in his post-conviction motion about Boone County having a higher rate of death sentences imposed.

■ "In actions under Rule 29.15, any allegations or issues that are not raised in the Rule 29.15 motion are waived on appeal." *State v. Clay,* 975 S.W.2d 121, 141–42 (Mo. banc 1998). Pleading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal. *State v. Harris,* 870 S.W.2d 798, 815 (Mo. banc 1994). To the extent that Johnson now claims that the imposition of the death penalty is arbitrary and capricious because Boone County has a disproportionate number of death sentences, this claim has not been preserved for appellate review. Moreover, claims that Missouri's statutory death penalty scheme is unconstitutional because it vests too much power in the prosecutor have been rejected by this Court. *See State v. Whitfield,* 837 S.W.2d 503, 514–15 (Mo. banc 1992) (rejecting a claim that Missouri's death penalty statutes are unconstitutional because they allow for unfettered prosecutorial ex-

pression); *see also State v. Ramsey*, 864 S.W.2d 320, 330 (Mo. banc 1993).

Even if this claim were preserved, Johnson does not explain how the trial court clearly erred in finding that he failed to establish that the Missouri statutes are unconstitutional. The motion court found the study on which Johnson relied was "severely flawed" and stated, "[b]ased on the numerous misconceptions in this research, the numerous flaws in the data, the lack of knowledge as to the process of charging, pursuing, and proving a murder charge and pursuing a death sentence, this court finds [Johnson] has failed to sustain his burden and fails to establish that the Missouri statutes are unconstitutional." In his brief, Johnson attempts to rehabilitate the study's credibility but does not explain how the trial court erred in finding that he did not meet his burden. Citing to several cases from other states, he suggests that objections to a study's completeness and to missing data do not invalidate the study, but rather detract from the weight of the study's conclusions. Even if those cases are controlling, the motion court had numerous additional problems with the study beyond its incompleteness, including the fact that the professor who conducted the study lacked "professional and practical experience in criminal law." And even if the study was not flawed, it does not necessarily establish that Missouri's statutory scheme is unconstitutional.

Johnson suggests that because the study followed generally accepted statistical analyses, the study was not flawed and, therefore, the motion court must have erred in rejecting the study. Johnson provides no support for this argument. He has failed to show the motion court clearly erred in finding that he did not establish

that the death penalty statutes are unconstitutional.[8]

### Conclusion

For the foregoing reasons, the judgment is affirmed.

All concur.

---

8. Significantly, the study on which Johnson relies dealt with homicide cases in Missouri with an initial charging date between January 1, 1997, and December 31, 2000. Johnson was charged in 1994.