

# SUPREME COURT OF MISSOURI
## en banc

BRIAN J. DORSEY, )
         )
        Appellant, )
        )
v. )   No. SC93168
        )
STATE OF MISSOURI, )
        )
        Respondent. )

### APPEAL FROM THE CIRCUIT COURT OF BOONE COUNTY
The Honorable Christine Carpenter, Judge

*Opinion issued November 12, 2014*

Brian J. Dorsey appeals the judgment overruling his motion for post-conviction relief, pursuant to Rule 24.035 and Rule 29.15, from his 2008 convictions and sentences for two counts of first-degree murder. Because Mr. Dorsey was sentenced to death on each count, this Court has jurisdiction. Mo. Const. art. V, sec. 10. On appeal, Mr. Dorsey claims that the motion court erred in overruling his claims that he received ineffective assistance from his trial counsel and that the state failed to disclose exculpatory evidence. This Court affirms the motion court's judgment.

### Factual and Procedural Background

On December 23, 2006, Brian J. Dorsey's family was concerned that he was in trouble because of money he owed to drug dealers. He had called several family members asking to borrow money because there were two drug dealers in his apartment

and he needed help. Mr. Dorsey's cousin, Sarah Bonnie, Sarah's husband Ben,[1] and two others went to Mr. Dorsey's apartment. The two drug dealers left Mr. Dorsey's apartment when his family arrived. The Bonnies then took Mr. Dorsey to their home, where they spent the evening drinking and playing pool in the Bonnies' "shop" with other family members and Darin Carel, a family friend. A shotgun had to be moved off the pool table before they could play pool. During the evening, Mr. Dorsey drank seven to ten beers.

After everyone except Mr. Dorsey and Mr. Carel had left, the Bonnies went to bed. After Mr. Carel left, Mr. Dorsey found a bottle of vodka and drank some of it. He then retrieved the single-shot, 20-guage shotgun from the Bonnies' shop and fatally shot the Bonnies while they were in their bed. He then had sexual intercourse with Sarah's body. Afterward, he poured bleach on Sarah's torso and genital area and stole several items from the house, including Sarah's vehicle. Mr. Dorsey used some of the property to pay a debt for money he borrowed for drugs from Patricia Cannella and tried selling other stolen items, including the shotgun, to various people throughout the night. He was driving a white car, which he said was his, and the property he was trying to sell was in the car. He was heavily intoxicated and had the bottle of vodka with him.

The next day, Sarah's parents became worried when the Bonnies did not show up for a family gathering. They went over to the Bonnies' house and found their four-year-old daughter, who told them that her parents had been locked in the bedroom all day.

---

[1] Sarah Bonnie and Ben Bonnie will be referenced by their first names to avoid confusion. No disrespect is intended.

When Sarah's parents were able to get into the locked bedroom, they found the Bonnies dead.

A sexual assault kit was used to collect evidence from Sarah's body, and the vaginal swabs taken were sent to the Missouri State Highway Patrol crime laboratory for testing. A presumptive test indicated a possible, but unconfirmed, presence of sperm cells. A full autosomal DNA profile was then created from the swab.[2] The profile was consistent with Sarah's DNA, indicating she was the sole source of the DNA, and eliminated Mr. Dorsey as the source of the autosomal DNA. An extraction was then performed to target DNA on any Y chromosomes in the sample because only males have Y chromosomes. The Y-chromosome profile eliminated Ben and Mr. Carel, who had been at the Bonnies' house on the night of the murders, as the source of the DNA. It did not eliminate Mr. Dorsey as the source, however.

On December 26, Mr. Dorsey surrendered to police and admitted that he was "the right guy concerning the deaths of the Bonnies." Sarah's social security card was found in Mr. Dorsey's back pocket. Later that day, police found Sarah's car with some of the Bonnies' property still inside and the shotgun in the trunk. Ms. Cannella identified many of the items in the car as those Mr. Dorsey had been trying to sell on the morning of December 24. Mr. Dorsey was charged with two counts of first-degree murder. Chris Slusher and Scott McBride were hired by the office of the Missouri State Public Defender to represent Mr. Dorsey on these charges for a flat fee. Mr. Slusher was primarily

_____

[2] A full autosomal profile consists of 15 loci with presumably two alleles for each locus. A full autosomal profile essentially acts as an absolute identification of an individual because it is expected to be found only once in every 15 quadrillion people.

3

responsible for investigating and preparing mitigation evidence, while Mr. McBride was primarily responsible for reviewing the DNA evidence.

In March 2008, Mr. Dorsey pleaded guilty to both counts. A jury trial was then held for the penalty phase. The jury recommended a sentence of death for each murder, finding both murders were committed while Mr. Dorsey engaged in the commission of another unlawful homicide, committed for the purpose of receiving money or any other thing of monetary value, and involved depravity of mind and manner. The jury also found the murder of Sarah was committed while Mr. Dorsey was engaged in the crime of rape. The trial court sentenced Mr. Dorsey accordingly. This Court affirmed Mr. Dorsey's convictions and sentences. *State v. Dorsey*, 318 S.W.3d 648 (Mo. banc 2010).

Mr. Dorsey then filed a *pro se* motion to vacate his convictions and sentences pursuant to Rule 29.15, and appointed counsel filed an amended motion. After a three-day evidentiary hearing, the motion court entered findings and overruled Mr. Dorsey's motion. Mr. Dorsey appeals the denial of post-conviction relief.

**Standard of Review**

Appellate review of the denial of post-conviction relief is limited to a determination of whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rules 24.035(k) and 29.15(k). "A judgment is clearly erroneous when, in light of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Swallow v. State*, 398 S.W.3d 1, 3 (Mo. banc 2013).

Even if the stated reason for a motion court's ruling is incorrect, this Court will affirm the judgment if it is sustainable on other grounds. *Id.*

## Issues on Appeal

Mr. Dorsey claims the motion court erred in overruling his claims that the state failed to disclose exculpatory DNA evidence and additional CODIS hits of Timothy Kathcart, Brandon Brown, Jeremy Morgan, and Charles Forbes. He also claims the motion court erred in denying his claims that trial counsel were ineffective for not: (1) investigating and presenting evidence of a peak deleted from the autosomal DNA profile that allegedly would have shown a contributor other than Mr. Dorsey and Sarah to the DNA in the vaginal swab; (2) investigating and presenting evidence to counter the Y-chromosome DNA profile; (3) objecting to the state's implication that a man who matched the Y-chromosome profile was incarcerated at the time of the murders; (4) investigating a diminished capacity defense; (5) investigating and presenting mitigating evidence relating to his state of mind; (6) presenting testimony from Mr. Dorsey's treating physicians; (7) objecting to testimony on the alternative light source as junk science and request a *Frye*[3] hearing or, alternatively, countering the testimony; and (8) moving to strike for cause juror Ryan Reddick, who had worked with Ben for six months. Lastly, Mr. Dorsey asserts the motion court erred in overruling his ineffective assistance of counsel claim based on a conflict of interest arising out of the flat-fee arrangement.[4]

---

[3] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).
[4] The points relied on in Mr. Dorsey's brief contain multiple claims, violating Rule 30.06. *See Christeson v. State*, 131 S.W.3d 796, 799 n.5 (Mo. banc 2004). This Court will not

5

**Failure to Disclose and Investigate Peaks in Autosomal DNA Profile**

Mr. Dorsey asserts the motion court erred in overruling his claim that the state failed to disclose and counsel were ineffective in investigating and presenting exculpatory DNA evidence. Specifically, he argues that the autosomal DNA profile created from the vaginal swab contained a "peak" depicting an allele that excludes Mr. Dorsey from that profile[5] and that the state deleted this peak before providing the DNA evidence in discovery.[6] The peak was inconsistent with the DNA of Sarah and Mr. Dorsey. Mr. Dorsey argues the presence of this peak shows that the autosomal DNA profile depicted DNA from two donors, instead of only Sarah, and that the other donor could not have been Mr. Dorsey.[7] He maintains, therefore, that, the state's failure to disclose this information violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963), because this deleted peak was exculpatory evidence that proves he did not rape Sarah. In addition to the *Brady* claim for the state's nondisclosure of this peak, Mr. Dorsey also raises a

_____

exercise its discretion to disregard these points because, while technically defective, they provide sufficient notice of Mr. Dorsey's claims. *See id.* Nevertheless, his claims have been separated and reordered for ease of understanding.

[5] The state denies that the peak represents an allele because its expert found that the peak was merely an artifact of the DNA replication process.

[6] As Mr. Dorsey notes in his brief, there were two peaks deleted. The peak at the CSF locus showed a possible allele that Mr. Dorsey's DNA does not have, which is why he focuses on the deletion of this peak. The other peak, located at the FGA locus, is consistent with Mr. Dorsey's DNA.

[7] Because both deleted peaks were consistent with Ben's DNA, Mr. Dorsey posits that Ben was the other donor and that the unconfirmed sperm cells in the sample would have been from Ben. Significantly, the presence of these peaks on the autosomal DNA profile does not affect the Y-chromosome DNA profile, which was consistent with Mr. Dorsey and inconsistent with Ben. At the evidentiary hearing, Mr. Dorsey's expert testified that the Y-chromosome DNA may not have necessarily come from the sperm cells. Accordingly, Mr. Dorsey argues that the Y-chromosome DNA could have been present in vaginal swab due to "an innocent transfer of skin cells."

claim of ineffective assistance of counsel for not investigating the electronic DNA evidence, which would have led to the discovery of the deleted peak.

Mr. Dorsey's *Brady* and ineffective assistance of counsel claims relating to the deleted peak were not preserved for review. While Mr. Dorsey presented evidence of the peak at the evidentiary hearing, his amended Rule 29.15 motion fails to raise these claims. Claims not raised in a Rule 29.15 motion are waived on appeal. *McLaughlin v. State*, 378 S.W.3d 328, 340 (Mo. banc 2012). "Pleading defects cannot be remedied by the presentation of evidence and refinement of a claim on appeal." *Johnson v. State*, 333 S.W.3d 459, 471 (Mo. banc 2011). Furthermore, there is no plain error review in appeals from judgments on post-conviction motions. *McLaughlin*, 378 S.W.3d at 340.

The only claim relating to the DNA evidence is claim 8(A) of the amended motion, which alleged, "Ineffective assistance of counsel—Failure to investigate and adduce evidence from a DNA expert in penalty phase to challenge the statutory aggravators and to investigate the Y-STR DNA analysis results prior to Movant's pleas of guilty." Specifically, Mr. Dorsey alleged that counsel failed to investigate and/or call a DNA expert, such as Dr. Dean Stetler, to testify about the non-discriminatory nature of the Y-chromosome profile and the state's failure to perform a differential extraction on the DNA to create a more discriminatory profile.

In denying claim 8(A), the motion court found that Mr. Dorsey failed to properly raise a claim that the state did not disclose evidence of the peak in violation of its duties under *Brady*. The court stated that the allegation that the state failed to disclose evidence of the peak "appears to have been an allegation made by Dr. Stetler that the State was not

7

prepared to address because the State had no notice the allegation was being made." The court also found the allegation that the state failed to disclose this information was not accurate because the DNA report in the pretrial disclosures states, "removed stutter 10% at CSF and 14% FGA." The court did not specifically address whether Mr. Dorsey properly pleaded a claim of ineffective assistance of counsel for failing to investigate the deleted peak, but this Court finds it was not properly pleaded. The amended motion only alleged that counsel should have investigated and presented evidence to counter the Y-chromosome profile. The amended motion does not allege that counsel failed to investigate and counter the evidence of the autosomal profile, which is the one that Mr. Dorsey claims contained an additional peak.

To show he properly raised these claims, Mr. Dorsey points to statements in claim 8(A). In detailing counsel's investigation of the DNA evidence, the amended motion states: "Trial counsel received a packet of materials from the State consisting of information . . . regarding the DNA testing . . .. This information from the state did not include any electronic data from the Missouri State Highway Patrol regarding the DNA testing in Mr. Dorsey's case." Mr. Dorsey argues this statement sufficiently raised his *Brady* claim that the state failed to disclose the exculpatory DNA evidence showing the presence of the peak that would have indicated another contributor to the DNA from the vaginal swab. This declaration that the information provided to counsel did not include electronic data does not, in itself, preserve a *Brady* claim or ineffective assistance of counsel claim for failure to investigate the peak evidence. *See State v. Shafer*, 969 S.W.2d 719, 737-78 (Mo. banc 1998). In his amended motion, Mr. Dorsey did not allege

8

that the failure to include the electronic data prevented him from discovering exculpatory evidence or even that the electronic data would have revealed the deleted peaks.

Mr. Dorsey also argues these claims were tried by implied consent because the state did not object to any of the testimony or related exhibits concerning the deleted peak. Issues tried by implied consent are considered part of the pleading under Rule 55.33(b). Rule 55.33(b) does not apply to Rule 29.15 motions, however. *State v. Vinson*, 800 S.W.2d 444, 447 (Mo. banc 1990); *State v. Perry*, 820 S.W.2d 570, 575 (Mo. App. 1991). Claims are waived if not presented in the motion, regardless of whether evidence on that claim was presented. *Perry*, 820 S.W.2d at 575. Therefore, the motion court did not clearly err in finding that Mr. Dorsey waived his claims involving deleted peaks.

### Failure to Disclose Additional CODIS Hits

Mr. Dorsey asserts the motion court erred in overruling his claim that the state did not disclose that it had additional "hits" on CODIS matching the Y-chromosome DNA profile developed from Sarah's vaginal swab. He argues this nondisclosure was prejudicial because, had Mr. Dorsey been able to present evidence about the additional hits, there is a reasonable probability the jury would not have sentenced him to death. To prevail on a *Brady* claim, a movant must show each of the following: (1) the evidence at issue is favorable to movant either because it is exculpatory or because it is impeaching; (2) the state suppressed the evidence either willfully or inadvertently; and (3) the movant was prejudiced by such suppression. *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 126 (Mo. banc 2010). To show prejudice, the movant must show that the evidence at

9

issue is material, i.e., a reasonable probability that the result would have been different. *State ex rel. Woodworth v. Denney*, 396 S.W.3d 330, 338 (Mo. banc 2013).

During the penalty phase, Jason Wyckoff, a DNA analyst at the highway patrol laboratory, testified that he procured a Y-chromosome profile from the sample taken from Sarah. He determined the profile matched Mr. Dorsey's DNA. Mr. Wyckoff explained that because the Y chromosome is passed from father to son, it is shared within a male lineage. He also testified that there are non-related males sharing the same Y-chromosome profile and that it is shared on average by 2.3 individuals out of 1,000.

At the evidentiary hearing, Brian Hooey, supervisor of the highway patrol laboratory, testified he notified the prosecutor in Mr. Dorsey's case of a CODIS hit on the Y-chromosome profile matching a male named John Henry Sim. On August 20, 2008, there was another hit matching Timothy Kathcart. After Mr. Dorsey's trial, it was determined that there had been subsequent hits matching three other men. Mr. Hooey also testified that the number of matches on the CODIS system did not change the given frequency of 2.3 individuals out of 1,000.

Admitted into evidence was a letter from the prosecutor to Mr. Slusher disclosing that Mr. Sim came up as a match with the Y-chromosome profile. He explained that the probability of someone being a match to the Y-chromosome profile is 2.3 out of 1,000 males and predicted that there would be more matches.

The motion court concluded there was no *Brady* violation because the state disclosed the information through the prosecutor's letter to Mr. Slusher. The court found that the state's nondisclosure of the identities of matches other than Mr. Sim was not

10

prejudicial to Mr. Dorsey given that counsel was made aware of the likelihood of other matches. Additionally, the court found that even if the state had disclosed the identities of the additional matches, counsel could not have argued that one of those men committed the rape because there was no evidence directly connecting any of the men to the crime.

While Mr. Dorsey argues that all four additional matches from CODIS should have been disclosed, the only one relevant to this *Brady* claim is the identity of Mr. Kathcart because he was the only match, besides Mr. Sim, resulting in a CODIS hit before the penalty phase of Mr. Dorsey's trial. Mr. Kathcart's identity, therefore, is the only one that the state could have disclosed.[8]

The motion court did not clearly err in finding that the state's failure to disclose additional matches was not prejudicial. The fact that there was an additional match to the Y-chromosome profile would have had little to no effect on the state's evidence that Mr. Dorsey's DNA matched the Y-chromosome profile. The jury heard testimony that 2.3 out of 1,000 Caucasian males are expected to share the same Y-chromosome profile and that the state was already aware of one man, Mr. Sim, who was a match. The fact that other hits had occurred does not change this statistical likelihood of finding another man with the same profile.

---

[8] Mr. Dorsey argues all the hits are relevant because Mr. Hooey testified that "[t]he information was probably available to [him] in August 2008." However, Mr. Hooey testified that the hits associated with Mr. Brown, Mr. Morgan, and Mr. Forbes did not occur until October 2009, June 2009, and August 2009, respectively. Mr. Dorsey's claim that all the hits were known before trial ignores the dates of each of these hits and Mr. Hooey's explanation that the searches to find hits were performed weekly. If the information to obtain a hit was in the system before Mr. Dorsey's trial, the computer would have generated these hits before October 2009.

11

Additionally, Mr. Dorsey does not show a reasonable probability that the jury would have found that Mr. Kathcart raped Sarah. Without evidence directly connecting Mr. Kathcart to the crime, Mr. Dorsey would not have been allowed to introduce evidence or argument to suggest that Mr. Kathcart committed the rape. *See State v. Butler*, 951 S.W.2d 600, 606 (Mo. banc 1997). Even if the evidence could have been admitted, the jury was already aware that other men could have the same Y-chromosome profile, and Mr. Dorsey presented no evidence connecting Mr. Kathcart—or any of the other matches—to the Bonnies or Callaway County, where the murders occurred. Mr. Dorsey points out that neighbors testified to hearing a loud truck the night of the murders and that Mr. Kathcart owned a truck at that time. This evidence, considered with the fact that Mr. Kathcart was a match with the Y-chromosome profile, does not create reasonable probability that the jury would have found Mr. Dorsey did not rape Sarah.

### Failure to Challenge the Y-Chromosome Profile

Mr. Dorsey claims the motion court erred in denying his claim of ineffective assistance of counsel for not challenging the state's Y-chromosome profile with expert testimony stating that the profile was not very discriminatory and that the state could have performed a different extraction process to obtain a more discriminatory profile. He argues that, but for the ineffectiveness of counsel, he would not have pleaded guilty and the jury would not have sentenced him to death.

To be entitled to post-conviction relief for ineffective assistance of counsel, a movant must demonstrate by a preponderance of the evidence that (1) trial counsel failed to exercise the level of skill and diligence that reasonably competent counsel would

12

exercise in a similar situation and (2) the movant was prejudiced by that failure. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *McIntosh v. State*, 413 S.W.3d 320, 324 (Mo. banc 2013). There exists a strong presumption that counsel's conduct was reasonable and effective. *McIntosh*, 413 S.W.3d at 324. "To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.* (internal quotations omitted). "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable . . .." *Anderson v. State,* 196 S.W.3d 28, 33 (Mo. banc 2006) (internal quotations and citations omitted).

To satisfy the prejudice prong of the *Strickland* test, a movant must show a reasonable probability that, but for counsel's errors, the outcome would have been different. *McLaughlin*, 378 S.W.3d at 337. "A reasonable probability exists when there is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotations omitted). To challenge a death sentence, the movant "must show with reasonable probability that the jury or judge, balancing all the circumstances, would not have awarded the death penalty." *Id.* To challenge a guilty plea, the movant must show that counsel's errors impinge on the voluntariness and knowledge with which the plea was made and that, but for those errors, the movant would have not pleaded guilty and demanded a jury trial. *Cooper v. State*, 356 S.W.3d 148, 153 (Mo. banc 2011).

At the evidentiary hearing, Dr. Stetler testified that the Y-chromosome profile is not a very discriminatory type of DNA profile because it will arise in 2.3 men out of

13

1,000, whereas a full autosomal profile "is essentially an absolute identification of that individual." Dr. Stetler explained that the state could have performed a differential extraction, which would have yielded a male autosomal profile from any sperm cells in the sample.[9] The state did not do this type of extraction, however.

The motion court found Mr. Dorsey was not prejudiced by counsel's failure to investigate and present the testimony of Dr. Stetler or similar testimony from a DNA expert because the jury was aware of the probability that there would be other matches to the Y-chromosome profile and because Mr. Dorsey did not show that the differential extraction would have produced favorable evidence. Additionally, it concluded that the state's failure to perform a differential extraction would have been inadmissible because the state is not required to gather or present certain types of evidence. The court also found that the decision not to challenge the DNA evidence was a part of counsel's reasonable trial strategy of Mr. Dorsey pleading guilty.

The motion court's finding that counsel's decision not to investigate this evidence did not prejudice Mr. Dorsey is not clearly erroneous. The state is not required "to gather and present all physical evidence conceivably germane to its case in chief," and a defendant may not argue an adverse inference from the state's alleged failure to perform a particular test. *State v. Schneider*, 736 S.W.2d 392, 402 (Mo. banc 1987). Mr. Dorsey

---

[9] There is a question as to whether the state had the ability to create a full autosomal profile on the male DNA. Dr. Stetler testified that a full autosomal profile from a differential extraction would require about 15 to 20 intact sperm cells. In a pretrial deposition, however, Mr. Wyckoff explained that he did not do a differential profile because he was unable to confirm the presence of semen.

would not have been able to argue an adverse inference from the state's failure to perform a differential extraction.

Mr. Dorsey's decision to plead guilty was not prejudiced by counsel's failure to investigate the Y-chromosome evidence, particularly in light of the substantial evidence indicating that Mr. Dorsey committed the murders. Mr. Dorsey was the last person at the Bonnies' house the night of their deaths. The next day, he had Sarah's car and was attempting to sell items that had been stolen from the Bonnies' house on the night of the murders, including the same type of gun used to kill the Bonnies. Mr. Dorsey voluntarily came to the police station and told police that he was the person they needed to talk to about the murders. While at the police station, the police found Sarah's social security card in Mr. Dorsey's pocket. Additionally, Mr. Dorsey's DNA was consistent with DNA found on Sarah's body. In light of this evidence, there is not a reasonable probability that Mr. Dorsey would have elected to go to trial had he known that the Y-chromosome profile was not very discriminatory and that the state failed to obtain a more discriminatory profile.

Mr. Dorsey further fails to show any prejudice resulting from counsel's failure to present testimony at the penalty phase to challenge the Y-chromosome profile and method used to obtain it. During the penalty phase, Mr. Wyckoff testified that a Y-chromosome profile is not as discriminatory as an autosomal profile and that a match to this Y-chromosome profile may arise 2.3 times out of a thousand individuals in the Caucasian population. He also testified that another man in the CODIS system, Mr. Sim, was also a match for the profile. From his testimony, the jury was aware that the

Y-chromosome profile did not conclusively show the DNA came from Mr. Dorsey and that Y-chromosome profiles are not as discriminatory as an autosomal profiles. Dr. Stetler's testimony that it was possible for the state to obtain an autosomal profile by using a different method would have made little difference. Because Mr. Dorsey does not show a reasonable probability that he would not have pleaded guilty or that the jury would not have recommended the death penalty if counsel had investigated and presented this evidence, the motion court did not clearly err in overruling this claim for relief.

**Failure to Object to Prosecutor's Implication Regarding Mr. Sim**

Next, Mr. Dorsey claims the motion court erred in overruling his claim of ineffective assistance of counsel for failing to object to the prosecutor's questions implying that Mr. Sim, who was a match with the Y-chromosome profile on CODIS, was incarcerated at the time of the murders and by failing to investigate and present evidence to refute that implication. He argues that counsel's errors were prejudicial because, without them, there is a reasonable probability the jury would have found he did not rape Sarah and would not have recommended he be sentenced to death.

While examining Mr. Wyckoff about Mr. Sim, the prosecutor asked about Mr. Sim's whereabouts at the time of the crime:

[Prosecutor:]. And Mr. Sim[] was, at that time and at the relevant times in this case, in prison, was he not?

[Mr. Wyckoff:]. I don't have that information.

[Prosecutor:]. But that's where that was developed from, if Mr. Sim[] was – the Sim[] sample was coded when he entered the Department of Corrections; correct? Isn't that the database it came from?

[Mr. Wyckoff:]. Yes.

16

Mr. Dorsey presented evidence at the evidentiary hearing that Mr. Sim was not in prison at the time of the murders. He argues counsel were ineffective for not investigating Mr. Sim to determine whether he was in prison at the time of the murders and for failing to object to the prosecutor's false implication. The motion court concluded Mr. Dorsey was not prejudiced because the prosecutor's questions did not mislead the jury and because the whereabouts of Mr. Sim was irrelevant.

"The mere failure to make objections does not constitute ineffective assistance of counsel." *Ervin v. State*, 80 S.W.3d 817, 822 (Mo. banc 2002). To obtain post-conviction relief based on a failure to object, it "must have been of such character as to deprive the defendant substantially of his right to a fair trial." *Id.* (internal quotations omitted). Mr. Dorsey provides no basis for the objection he claims counsel failed to make. Mr. Wyckoff testified that he did not have information about Mr. Sim's whereabouts at the time of the murder. The jury was, therefore, not misled. Counsel was not ineffective for not objecting to the prosecutor's questions.

Furthermore, Mr. Dorsey fails to show how he was prejudiced. Because counsel's trial strategy was to accept responsibility and seek mercy, rather than place the blame on others, the location of Mr. Sim was irrelevant. Additionally, the jury was instructed not to "assume as true any fact solely because it is included in or suggested by a question" and that "[a] question is not evidence, and may be considered only as it supplies meaning to the answer." This Court assumes that juries will follow the instructions of the court. *State v. Bowman*, 741 S.W.2d 10, 14-15 (Mo. banc 1987). Accordingly, this Court assumes that the jury in this case did not believe Mr. Sim was in prison at the time of the

17

murders based on the prosecutor's questions. Mr. Dorsey, therefore, could not have been prejudiced by counsel's failure to object.

## Failure to Investigate a Diminished Capacity Defense

Mr. Dorsey asserts the motion court erred in overruling his claim of ineffective assistance of counsel for failing to investigate whether he had diminished capacity at the time of the murders and for failing to advise him about a diminished capacity defense to the first-degree murder charges before he pleaded guilty. He argues that counsel's ineffectiveness prevented his guilty pleas from being entered in a knowing, intelligent or voluntary manner in that he would not have pleaded guilty if he was aware of his diminished capacity.

At the evidentiary hearing, Mr. Slusher testified that he was primarily responsible for investigating mental health issues and mitigation evidence. When he was hired by the public defender's office, he received a significant amount of discovery and mitigation evidence already collected, including Mr. Dorsey's history of depression, suicide attempts, and alcohol and drug abuse. Mr. Slusher then hired a neuropsychologist to perform testing on Mr. Dorsey. The neuropsychologist reported finding no evidence of "what he . . . would say would be a serious mental disease or defect of an organic defect." Mr. Slusher also hired Dr. Robert Smith, a clinical psychologist, to perform a psychological and chemical dependency evaluation, which is done to determine if, at the time of the offense, there are any diagnosable disorders that are significant to the case. Dr. Smith first met with Mr. Dorsey in August 2007, during which time they talked about Mr. Dorsey's history but not about the night of the offense. Dr. Smith indicated to

18

Mr. Slusher that talking to Mr. Dorsey's family would be helpful, but a meeting between Dr. Smith and Mr. Dorsey's family members was not arranged.

Mr. Slusher testified that he did not "remember really seriously considering doing the guilt-phase diminished capacity defense" but later testified that he thought he did consider such a defense prior to Mr. Dorsey pleading guilty. Mr. Slusher also testified that he assumed Dr. Smith's evaluation would cover diminished capacity and that he did not believe that Mr. Dorsey's case presented a type of mental disease or defect to provide a diminished capacity defense. Mr. Slusher considered the evidence of guilt in this case to be overwhelming and did not view the facts to be favorable to making a diminished capacity argument. He believed that pleading guilty and, thereby, accepting responsibility was the best chance Mr. Dorsey had at avoiding the death penalty. Accordingly, he advised Mr. Dorsey to plead guilty.

After pleading guilty, Mr. Dorsey met with Dr. Smith again.[10] During this visit, they discussed the events on the night of the murders. Based on his visits with Mr. Dorsey and on Mr. Dorsey's records provided by Mr. Slusher, Dr. Smith diagnosed Mr. Dorsey with major depressive disorder, recurrent alcohol dependence, and cocaine dependence. Dr. Smith testified on behalf of Mr. Dorsey during the penalty phase. He testified that Mr. Dorsey "has suffered from alcohol and drug addiction and depression all of his adult life." He also testified that none of these diagnoses "provide [Mr. Dorsey] the defense of insanity" but that they contributed to him committing the murders. He stated that Mr. Dorsey understood the difference between right and wrong but that

---

[10] Dr. Smith was scheduled to meet with Mr. Dorsey before he pleaded guilty, but a winter storm delayed their meeting.

Mr. Dorsey's capacity to conform his conduct to the requirements of the law was "diminished" at the time of the offense due to his depression and consumption of alcohol and drugs.

During the evidentiary hearing, Dr. Smith testified that he talked to Mr. Dorsey's parents, his uncle, and a family friend after sentencing. From talking with them, Dr. Smith discovered three new pieces of information: (1) Mr. Dorsey's mother had a history of depression; (2) some members of his extended family had a history of alcohol abuse; and (3) Mr. Dorsey's depression predated his drug use. Dr. Smith testified that this new information led him to determine that Mr. Dorsey was genetically predisposed to alcoholism and depression and that his depression contributed to the development of his addictions. Because of the genetic predispositions and other environmental influences, he believed Mr. Dorsey had "less responsibility for . . . becoming depressed and starting or continuing his addictive process." Dr. Smith reiterated his conclusion from the penalty phase that Mr. Dorsey's capacity to conform his conduct to the requirements of the law was impaired at the time of the murders. Additionally, he testified that Mr. Dorsey's depression, by itself, sufficiently diminished his capacity so that he was unable to deliberate prior to killing the Bonnies and that Mr. Dorsey was under the influence of extreme mental or emotional disturbance at the time of the murder.

Mr. Dorsey also presented the testimony of Dr. A.E. Daniel at the evidentiary hearing. Dr. Daniel, a forensic psychiatrist, had reviewed Mr. Dorsey's medical, psychological and substance abuse treatment records, met with Mr. Dorsey three times, and interviewed Mr. Dorsey's parents. He testified that Mr. Dorsey suffered from

20

chronic major clinical depression and chemical dependence. He testified that Mr. Dorsey informed him that he remembered being in the bedroom with the Bonnies but did not remember shooting them. Dr. Daniel explained that this statement was not necessarily inconsistent with Mr. Dorsey's statement to Dr. Smith that he remembered shooting the Bonnies because the statement to Dr. Smith might have been a result of extreme remorse. Dr. Daniel also testified that his evaluation showed that Mr. Dorsey had no sexually deviant interests. Dr. Daniel believed that Mr. Dorsey's depression and substance abuse caused Mr. Dorsey not to be able to coolly reflect on his conduct or appreciate the wrongfulness of his conduct and caused an extreme emotional and mental disturbance on the night of the murders.

The motion court found it was reasonable for counsel not to pursue a diminished capacity defense to seek a lesser conviction because a diminished capacity defense had "no real prospect of success" in light of the amount of evidence showing deliberation. It determined the testimonies of Dr. Smith and Dr. Daniel would not have convinced a jury to find that Mr. Dorsey was unable to form the requisite intent and would have revealed Mr. Dorsey's inconsistent statements regarding his memory of that night. The court also concluded a review of the transcript reflects Mr. Dorsey made a voluntary, knowing, and intelligent plea.

The motion court's conclusion that counsel's decision to not pursue a diminished capacity defense was reasonable is not clearly erroneous. Mr. Slusher testified that Mr. Dorsey's decision to plead guilty was a "fairly long process" and that he recommended pleading guilty because the evidence of guilt was "overwhelming."

21

Despite his statement that he did not seriously consider a diminished capacity defense, Mr. Slusher's testimony shows that he did consider such a defense but decided not to pursue it because he thought the facts of Mr. Dorsey's case "were not favorable" to such a defense. As the motion court pointed out, there was considerable evidence showing Mr. Dorsey acted intentionally when he killed the Bonnies: retrieving the shotgun from the barn; reloading the single-shot shotgun to kill Ben; locking the bedroom door to keep the Bonnies' daughter out of the room; stealing property from the Bonnies to sell; pouring bleach on Sarah's body to cover up the evidence; and turning himself into police and identifying himself as the one they needed to talk to about the Bonnies' murders. In light of this evidence and the fact that voluntary drug use played a role, Mr. Slusher did not believe a diminished capacity defense would be successful if Mr. Dorsey went to trial. Rather, he believed the best trial strategy to avoid the death penalty was for Mr. Dorsey to accept responsibility, which included pleading guilty.

Mr. Dorsey argues that a decision to not pursue a diminished capacity defense cannot be reasonable in the absence of a reasonable investigation into the possibility of such a defense. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In assessing the reasonableness of a decision not to investigate, great deference is applied to counsel's judgments. *Id.* By the time Mr. Dorsey pleaded guilty, counsel had a neuropsychologist and psychologist meet with and perform testing on Mr. Dorsey. Counsel also had Mr. Dorsey's case file from the public defender's office, which contained general discovery and a large number of mitigation records. Mr. Dorsey

22

claims that this investigation was insufficient in that counsel should have waited until Mr. Dorsey's second meeting with Dr. Smith and that counsel should have facilitated a meeting between Dr. Smith and Mr. Dorsey's parents. He also argues counsel should have hired a psychiatrist, like Dr. Daniel, to evaluate him. With such an investigation, Mr. Dorsey contends that counsel would have been aware that Mr. Dorsey's depression diminished his ability to form the requisite intent on the night of the murder.

Mr. Slusher's trial strategy to not pursue a diminished capacity defense—and, therefore, to not investigate further—was not unreasonable. Mr. Slusher had the mitigation files from the public defender's office, which showed Mr. Dorsey's history of depression. He had the neuropsychologist's opinion that there was no serious mental disease or defect from an organic defect. Mr. Slusher also was aware Mr. Dorsey was heavily intoxicated on the night of the murders and that voluntary intoxication cannot, by itself, provide the basis for a diminished capacity defense. *See State v. Erwin*, 848 S.W.2d 476, 480 (Mo. banc 1993). Further, Mr. Slusher testified that the facts of the case, such as the fact that Mr. Dorsey had to reload the shotgun before killing Ben, were not favorable to a diminished capacity defense because they supported a finding of deliberation. Instead of pursuing a defense he believed would not work, Mr. Slusher recommended that Mr. Dorsey plead guilty to demonstrate he was accepting responsibility to persuade the jury to not choose the death penalty. The motion court properly concluded Mr. Slusher's trial strategy was not unreasonable.

23

**Failure to Investigate and Present Mitigating Evidence from Dr. Smith**

Mr. Dorsey asserts the motion court erred in overruling his claim of ineffective assistance of counsel for failing to investigate and present evidence during the penalty phase supporting mitigating factors that Mr. Dorsey's capacity to appreciate the criminality of his conduct or conform his conduct to the law was impaired and that Mr. Dorsey was acting under the influence of extreme mental or emotional disturbance. Mr. Dorsey argues that had counsel set up a meeting between Dr. Smith and members of Mr. Dorsey's family prior to the penalty phase, Dr. Smith would have had the additional information he needed to testify about his genetic predisposition to depression and substance abuse and his extreme mental or emotional disturbance at the time of the murders. The motion court denied this claim, concluding that none of the three facts Dr. Smith discovered from his post-conviction interviews changed the opinions offered during the penalty phase and did not have any mitigating value beyond Dr. Smith's testimony at trial.[11]

Regardless of whether the additional conclusions in Dr. Smith's testimony at the evidentiary hearing have mitigating value, counsel's performance did not fall below the *Strickland* standard. During Dr. Smith's first meeting with Mr. Dorsey, Mr. Dorsey discussed his depression and substance abuse. Mr. Slusher also provided Dr. Smith with Mr. Dorsey's records, including school records, medical records, and court records,

---

[11] While Dr. Smith failed to explain how the new information caused him to conclude that Mr. Dorsey was operating under an extreme mental or emotional disturbance at the time of the murders, he did testify that the information he received from Mr. Dorsey's family led him to conclude Mr. Dorsey was genetically predisposed to depression and alcohol and drug abuse.

24

which provided more details regarding Mr. Dorsey's depression and suicide attempts. Dr. Smith testified that he mentioned to Mr. Slusher that talking with Mr. Dorsey's parents would be helpful, but there is no indication that Dr. Smith explained the importance of meeting with Mr. Dorsey's parents. Dr. Smith never qualified his opinion to Mr. Slusher as incomplete or in some way lacking because he did not meet with any family members. Mr. Slusher was not ineffective for not setting up a meeting with Dr. Smith and Mr. Dorsey's parents when Dr. Smith failed to explain the importance of such a meeting and when Mr. Slusher provided Dr. Smith a number of records with which to consult in making a diagnosis.

### Failure to Present Mitigating Testimony from a Psychiatrist

Mr. Dorsey asserts the motion court erred in overruling his claim of ineffective assistance of counsel for failing to present the testimony of a psychiatrist, like Dr. Daniel, as evidence supporting mitigating factors during the penalty phase. Mr. Dorsey argues there is a reasonable probability the jury would not have recommended the death penalty had Dr. Daniel's testimony regarding Mr. Dorsey's lack of the ability to appreciate the wrongfulness of his conduct and his extreme emotional and mental disturbance been presented during the penalty phase.

In denying this claim, the motion court concluded that counsel were not obligated to select any particular expert and that "Dr. Daniel offered nothing significantly additional or different than what was presented by Dr. Smith at trial." This Court agrees. At trial, counsel presented expert testimony from Dr. Smith regarding Mr. Dorsey's depression and substance abuse. Mr. Daniel's testimony in terms of the substance abuse

25

and depression is largely the same as Mr. Smith's testimony. As Mr. Dorsey points out, Dr. Daniel also testified that Mr. Dorsey did not exhibit sexually deviant interests and he did not remember shooting the Bonnies. The fact that Mr. Dorsey did not remember shooting the Bonnies was contradicted by Dr. Smith's testimony, and it offers little mitigating value, expect to suggest that Mr. Dorsey did not commit the murder. Likewise, the lack of a sexual deviant interest would also be favorable if Mr. Dorsey were arguing that he did not rape Sarah. These arguments, however, would have been contrary to counsel's trial strategy of accepting responsibility.

Mr. Dorsey argues counsel should have called a psychiatrist to testify because his depression and substance abuse were medical in nature. While there are differences between a psychiatrist and a psychologist, counsel were not ineffective for using a licensed clinical psychologist, such as Dr. Smith, instead of a psychiatrist when their testimonies as to Mr. Dorsey's condition would have been largely the same—that Mr. Dorsey had a long history of depression and drug and alcohol abuse.[12] "The choice of witnesses is ordinarily a matter of trial strategy and will not support an ineffective assistance of counsel claim." *Johnson v. State*, 388 S.W.3d 159, 166 (Mo. banc 2012) (internal quotation and citation omitted). Even if Dr. Daniel's testimony had been more favorable, counsel is not required to shop around for an expert witness who might

---

[12] Mr. Dorsey's argument that a psychiatrist should have testified in lieu of or in addition to a psychologist implies that testimony from a psychologist is not powerful enough. He cites to *Glass v. State*, however, in which this Court affirmed a motion court's finding that failure to call a neuropsychologist was prejudicial because neuro*psychology* evidence has "powerful, inherent mitigating value." 227 S.W.3d 463, 471 (Mo. banc 2007) (internal quotation and citation omitted).

provide more favorable testimony. *See McLaughlin*, 378 S.W.3d at 341. The motion court did not clearly err in overruling this claim.

### Failure to Present Testimony from Treating Physicians

Mr. Dorsey asserts the motion court erred in denying his claim that counsel were ineffective for failing to present testimony from Dr. Girard Moline and Dr. John Lyskowski concerning Mr. Dorsey's treatment for depression, substance abuse, and suicide attempts.[13] He claims there is a reasonable probability the jury would not have chosen the death penalty if such evidence had been presented.

Dr. Moline, a family practice physician, testified at the evidentiary hearing about his treatment of Mr. Dorsey from 2003 to 2005. He testified that he initially prescribed Zoloft to Mr. Dorsey for his depression and anxiety and Ambien for his trouble sleeping. After Mr. Dorsey indicated that he did not think the medications were working well, Dr. Moline prescribed Effexor, a more powerful antidepressant, and Klonopin for the anxiety. He also testified that about 30 to 40 percent of his patients are on antidepressants and that he did not believe Mr. Dorsey's depression to be severe enough to refer him to a specialist.

Dr. Lyskowski, a psychiatrist, also testified at the evidentiary hearing. Dr. Lyskowski met Mr. Dorsey in December 2005 when Mr. Dorsey was admitted to the hospital with specific suicidal thoughts. He diagnosed Mr. Dorsey with major depression

---

[13] Mr. Dorsey's point relied on also includes counsel's failure to introduce medical records. He fails to address the medical records in his argument, however. He does not specify what medical records counsel should have introduced or what information the records would have provided. By neglecting to develop this point, Mr. Dorsey failed to preserve it for review. *See State v. Isa*, 850 S.W.2d 876, 900-01 (Mo. banc 1993).

27

and placed him on suicide watch.  Dr. Lyskowski testified that, at the time, Mr. Dorsey was taking two antidepressants and a sleep aid.  Dr. Lyskowski increased the dosage of one of the antidepressants and also prescribed Klonopin for Mr. Dorsey's anxiety. Mr. Dorsey also received psychological treatment consisting of therapy and social services.  Mr. Dorsey left the hospital after six days but was readmitted four days later after he cut his wrist in a suicide attempt.  By the second admission, it became clear to Dr. Lyskowski that Dr. Dorsey was heavily abusing cocaine, which can worsen anxiety and cause paranoia and delusions.

The motion court concluded that counsel were not ineffective for not calling Dr. Moline and Dr. Lyskowski to testify and that Mr. Dorsey was not prejudiced by the absence of their testimonies.  The motion court's conclusion that counsel were not ineffective is not clearly erroneous because counsel presented the evidence to which Dr. Moline and Dr. Lyskowski would have testified.  At the penalty phase, Dr. Smith testified that he reviewed Mr. Dorsey's educational records, medical records, psychiatric records, criminal background records, and substance-abuse treatment records and that the records showed Mr. Dorsey had "suffered from alcohol and drug addiction and depression all of his adult life."  He specified that Mr. Dorsey had at least three prior treatments for alcohol and drug addictions and that he had previously been diagnosed as alcohol dependent and cocaine dependent.

Dr. Smith also provided details about Mr. Dorsey's history with depression, stating that it is "clearly documented beginning at age 22."  He mentioned Mr. Dorsey's hospitalization after a suicide attempt and his depression that was documented in his

28

records through 2005. Dr. Smith testified that Mr. Dorsey was admitted to the hospital twice in 2005 for suicidal ideation and severe depression. While he did not provide the specific drug names or dosages, Dr. Smith testified that Mr. Dorsey had taken "six different antidepressants at different points with minimal benefit." He explained that because Mr. Dorsey experienced depression at a young age, he is resistant to various medications. Dr. Smith also stated that Mr. Dorsey had been admitted to a psychiatric facility at least three times and had outpatient therapy for his depression. Dr. Smith explained that his diagnoses of major depressive disorder, recurrent, meant that Mr. Dorsey suffered from symptoms of depression repeatedly over time.

Patty Dorsey, Mr. Dorsey's mother, also testified during the penalty phase about her son's drug and alcohol use and his suicide attempts. She testified that Mr. Dorsey first attempted suicide in 1993 or 1995 when he ingested a large amount of pills. She stated that Mr. Dorsey was taken to the hospital where he had his stomach pumped. He spent a couple of days in the intensive care unit before spending an additional four days in the psychiatric unit. Ms. Dorsey also testified to Mr. Dorsey's problems with alcohol and drugs and his attempts to receive treatment. Other family members also testified about Mr. Dorsey's suicide attempts and drug problems.

"Counsel is not ineffective for not presenting cumulative evidence." *Johnson*, 388 S.W.3d at 167. Counsel called multiple witnesses to apprise the jury of Mr. Dorsey's depression and his alcohol and drug dependence. Aside from providing details about the medications, the testimonies of Dr. Moline and Dr. Lyskowski would have been substantially cumulative on the issues of Mr. Dorsey's depression and substance abuse.

29

The only additional evidence that could have been provided by these doctors was that Mr. Dorsey also suffered anxiety and trouble sleeping. Even without evidence of anxiety, however, the evidence counsel did present sufficiently informed the jury of Mr. Dorsey's mental health problems and drug and alcohol abuse. Therefore, counsel were not ineffective for not calling Dr. Moline and Dr. Lyskowski to testify at trial.[14]

**Failure to Object to Testimony Regarding Alternative Light Source
or Present Countering Evidence**

Mr. Dorsey asserts counsel were ineffective for failing to object to the state's evidence regarding the alternative light source and request a *Frye* hearing and for not presenting evidence to controvert evidence that Mr. Dorsey poured bleach on Sarah. He claims the jury would have found Mr. Dorsey did not rape Sarah and, consequently, would not have chosen the death penalty had counsel not been ineffective.

During the penalty phase, Detective Jeff Nichols testified about the crime scene. He testified there was a strong odor of bleach in the bedroom, particularly near the bathroom and on the side of the bed where Sarah was found. Detective Nichols also observed a bottle of bleach in the sink in the master bathroom and discolored, or "bleached out, carpet next to the side of the bed where Sarah was lying. He sent a piece of the carpet to a laboratory for testing but never received a report from the laboratory.

---

[14] Mr. Dorsey stresses Mr. Slusher's testimony at the evidentiary hearing that he did not know why he did not contact Dr. Lyskowski and that his "intent was probably to have Dr. Smith cover such things." The fact that Mr. Slusher could not explain why he did not contact Dr. Lyskowski does not necessarily mean he was ineffective. The *Strickland* test for ineffectiveness is an objective one: What would a reasonably competent attorney do in a similar situation? *Strickland*, 466 U.S. at 687-88. So long as Mr. Slusher performed as a reasonably competent attorney would, his subjective reasoning behind his performance is irrelevant. *See Cofske v. United States*, 290 F.3d 437, 444 (1st Cir. 2002).

When asked whether he had seen anything else relating to the "bleach investigation," Detective Nichols responded, "I utilized an alternative light source in order to enhance or actually to look for fluids or trace evidence, anything that would not be visible to the naked eye. And on the mid-section of the female victim, I observed what appeared to be a pour pattern." When asked about the "bleach investigation" later, Detective Nichols stated, "Well, I took these photographs utilizing the alternative light source. And it simply made it possible for me to be able to see where the liquid had been poured on her groin area." A photograph of Sarah that displayed the markings was admitted into evidence. Additionally, Mr. Wyckoff testified that he was unable to confirm the presence of semen from the vaginal swab taken from Sarah and explained that the highway patrol laboratory's experiments showed some "chemical insults" will prevent proteins present in semen from being detected. He clarified that he was referring to "soap, detergent, cleansers and so forth."

Mr. Dorsey argues counsel should have objected to this evidence because the state did not demonstrate that an alternative light source detects bleach or that bleach prevents the state from confirming the presence of semen. He claims the trial court would have excluded the evidence relating to the alternative light source and the studies about "chemical insults" because the state would have been unable to provide the proper foundation under *Frye*, 293 F. 1013.

At the evidentiary hearing, photography professor Joseph Johnson explained that certain substances can be made to fluoresce, or give off light, under an alternative light source. Mr. Johnson testified about an experiment he conducted to determine if another

substance, other than bleach, could have caused the pour pattern that was made visible with the alternative light source. He obtained what he believed was comparable equipment to that used by Detective Nichols. He poured beer and bleach on a woman's arms and took photographs of her arms over the course of ten hours using an alternative light source.[15] Based on these photographs, Mr. Johnson concluded that beer and bleach fluoresce similarly.

The motion court concluded that counsel did not need to object to the alternative light source evidence as "junk science." It pointed out that Mr. Dorsey's argument was that another substance could have caused the pour marks but that Detective Nichols did not offer a conclusion that the pour marks were from bleach. The court also concluded that counsel were not ineffective for not calling Mr. Johnson as a witness because the court did not believe Mr. Johnson's testimony would have been helpful and would have conflicted with counsel's trial strategy of avoiding focusing on the rape.[16]

For criminal cases, Missouri follows the standard for admissibility of results of scientific procedures enunciated in *Frye*. *State v. Davis*, 814 S.W.2d 593, 600 (Mo. banc 1991). Accordingly, results of scientific procedures "may be admitted only if the procedure is 'sufficiently established to have gained general acceptance in the particular

---

[15] Mr. Johnson chose beer because photographs from the crime scene showed several cans of beer. The motion court noted that the brand of beer Mr. Johnson used was not one of the brands present in the photographs.

[16] The motion court pointed out a number of flaws with Mr. Johnson's experiment and testimony. It found that Mr. Dorsey did not establish that the equipment used by Mr. Johnson was comparable to the equipment used by Detective Nichols. It also noted that while beer was chosen because crime scene photographs shows several cans of beer, Mr. Johnson did not use a brand of beer that was present in the photographs. The court disbelieved Mr. Johnson's conclusion that bleach and beer fluoresce similarly, observing that the darkness between the arm with beer and the arm with bleach was distinct.

field in which it belongs.'" *Id.* (quoting *Frye*, 293 F. at 1014). Assuming that using an alternative light source is a scientific procedure, Mr. Dorsey fails to show that counsel were ineffective by not objecting to Detective Nichols' testimony and requesting a *Frye* hearing.

Mr. Johnson's testimony does not prove that, had counsel requested a *Frye* hearing, the state would have been unable to show that an alternative light source reliably shows the presence of bleach. On the contrary, Mr. Johnson's testimony and the photographs from his experiment demonstrate that an alternative light source does detect bleach. While his experiment shows an alternative light source will also detect beer, there was no testimony that the pour marks came from bleach. Detective Nichols testified that the alternative light source showed some liquid left a "pour pattern" on Sarah. He never stated that the alternative light source showed a presence of bleach, nor did the prosecutor characterize Detective Nichols' testimony as such.[17] It was left to the jurors to determine whether the pour marks came from bleach in light of the fact that

---

[17] This case is markedly different from *State v. Daniels*, which involved testimony on the use of luminol, a presumptive test for the presence of blood. 179 S.W.3d 273, 281 (Mo. App. 2005). While the witnesses acknowledged that luminol does not conclusively demonstrate the presence of blood, they testified that luminol "responds to blood" and that luminol test results from areas of the defendant's house were positive for the presence of blood. *Id.* at 281-84. In closing arguments, the prosecutor reiterated that luminol picks up blood and that it was "more likely than not" that the luminescence revealed blood. *Id.* at 284. The court of appeals held that, absent confirmatory tests satisfying *Frye*, evidence that the positive luminol results show the presence of blood prejudiced the defendant and that the trial court abused its discretion in failing to conduct the requested *Frye* hearing. *Id.* at 285. Unlike in *Daniels*, neither Detective Nichols nor the prosecutor stated that the fluorescence from the alternative light source showed a presence of bleach.

33

there was a strong odor of bleach, "bleached out" carpet next to Sarah, and a bottle of bleach in a nearby sink.

Mr. Dorsey also argues that the state would have been unable to provide the proper foundation for Detective Nichols' conclusion that he saw "pour marks" on Sarah had counsel requested a *Frye* hearing. Detective Nichols stated he saw "what appeared to be a pour pattern." His observation of a "pour pattern" is not a scientific result subject to the *Frye* standard. Even if it were, Mr. Johnson's testimony does not show that the state would have been unable to distinguish between a pour pattern and a spill pattern. In fact, his testimony was based on his experiment where he intentionally poured bleach and beer on someone's arms.

As to Mr. Dorsey's claim that counsel should have requested a *Frye* hearing for Mr. Wyckoff's testimony about the effect of chemical insults, there was no evidence at the evidentiary hearing showing that these studies to which Mr. Wyckoff referred were performed with unreliable scientific procedures or that the results of the studies are unreliable. Therefore, Mr. Dorsey fails to show a reasonable probability of a different outcome had counsel requested a *Frye* hearing.

Additionally, Mr. Dorsey argues counsel were ineffective in not presenting Mr. Johnson's testimony to counter the state's theory that Mr. Dorsey spilled bleach on Sarah after raping her. He maintains the possibility that the substance on Sarah was beer demonstrates that someone may have spilled beer on Sarah or that she may have spilled it on herself earlier in the night. Considering the evidence of the presence of bleach elsewhere in the bedroom and the DNA evidence matching Mr. Dorsey, it was not

34

unreasonable for counsel not to investigate and present Mr. Johnson's testimony. Moreover, Mr. Dorsey's theory is contradicted by the evidence presented at the penalty phase. Detective Nichols testified that "there appeared to be some pour marks *going actually through* that dried blood area" on Sarah. (Emphasis added). There was also a photograph showing the pour marks in the blood. This evidence shows that whatever the pouring—or spilling—of a substance on Sarah occurred after she was shot.

Further, counsel's trial strategy was to prevent the jury from focusing on the rape. Mr. Slusher testified that he would have countered the rape allegations if there was a way to do so effectively, but Mr. Johnson's testimony would not have been an effective way. The motion court did not err in overruling Mr. Dorsey's claim that counsel were ineffective by failing to request a *Frye* hearing or counter the state's evidence with Mr. Johnson's testimony.

### Failure to Move to Strike Juror Reddick

In his next point, Mr. Dorsey asserts counsel were ineffective for failing to move to replace juror Ryan Reddick after Mr. Reddick disclosed that he knew Ben and for failing to reexamine Mr. Reddick after crime scene and autopsy photographs were shown.[18] He contends there is a reasonable probability the jury would not have recommended the death penalty had counsel not been ineffective.

---

[18] The state asserts that Mr. Dorsey waived his claim that counsel were ineffective for failing to question Mr. Reddick about his feelings after viewing the crime scene and autopsy photographs because the claim was not included in Mr. Dorsey's amended motion. Paragraph 8(J)(4) of the amended motion alleges that counsel did not ask follow-up questions after Mr. Reddick saw crime scene and autopsy photographs. His claim, therefore, is preserved for review.

After a photograph of Ben was admitted into evidence at trial, Mr. Reddick informed the bailiff that he may have worked with Ben. Mr. Reddick was questioned by the court and by counsel. Upon being told Ben had worked at Custom Muffler, Mr. Reddick confirmed that he had worked with him. He apologized for not realizing the connection earlier, stating "I did not have any clue about that." Mr. Reddick testified that he was Ben's supervisor for about six months and thought Ben did really good work. He did not socialize with Ben after work. Mr. Reddick testified that his prior acquaintance with Ben did not make a difference to him and that it would not influence his decision. After conferring for a couple of minutes, counsel informed the court that they were not requesting any action be taken with respect to Mr. Reddick.

At the evidentiary hearing, Mr. Slusher testified that he did not remember why they did not move to strike Mr. Reddick but that usually that type of decision is made based on whether the alternate juror's answers in voir dire were more favorable. Mr. McBride testified that he thought they did not move to strike because they had liked Mr. Reddick's answers during voir dire. While he could not recall, Mr. McBride thought the fact that the state would show crime scene and autopsy pictures of Ben would have been considered when they made the decision not to move to strike. The motion court overruled Mr. Dorsey's claim that counsel's failure to move to strike Mr. Reddick constituted ineffective assistance of counsel. It found that counsel's decision was a matter of sound trial strategy in light of Mr. Reddick's inability to recognize Ben until seeing a picture and his testimony that it would not influence his decision.

In cases in which the death penalty may be imposed, a person who cannot be impartial due to an improper predisposition is unfit to serve on the jury. *Anderson*, 196 S.W.3d at 41. Failure to strike an unfit juror is structural error, requiring the death sentence to be vacated. *Id.* The fitness of a juror is considered in the context of the entire examination of the juror and not by focusing on one response. *Middleton v. State*, 103 S.W.3d 726, 734 (Mo. banc 2003).

Having prior knowledge of the victim does not create an improper predisposition without a showing of bias. *Goeders v. Hundley*, 59 F.3d 73, 76-77 (8th Cir. 1995); *see also State v. Nicklasson*, 967 S.W.2d 596, 612 (Mo. banc 1998); *Davis v. State*, 600 S.W.2d 613, 614 (Mo. App. 1980). Here, Mr. Reddick testified that his prior history with Ben would not affect his decision in the case. Mr. Dorsey, nonetheless, argues that Mr. Reddick was biased because he held Ben in high regard, referring to Mr. Reddick's belief that Ben had done good work. Despite Mr. Dorsey's contentions, Mr. Reddick's opinion regarding Ben's performance at work does not demonstrate a bias. Mr. Reddick did not even remember Ben by name; he thought he may have worked with him only after seeing Ben's picture. Even then, he did not state definitely that he worked with Ben until someone confirmed that Ben worked at Custom Muffler. Mr. Dorsey further fails to show that counsel were ineffective by failing to question Mr. Reddick after crime scene and autophagy photographs of Ben were shown.

The trial transcript reflects that counsel took some time to deliberate before deciding not to move to strike Mr. Reddick from the jury. Mr. McBride testified he believed they made that decision because Mr. Reddick's voir dire answers were

favorable. It was reasonable for counsel to keep Mr. Reddick on the jury when he gave favorable answers in voir dire and testified that his prior relationship with Ben would not influence his decision. Accordingly, the motion court did not clearly err in overruling Mr. Dorsey's claim.

## Conflict of Interest Arising from Flat Fee

In his final point on appeal, Mr. Dorsey asserts counsel were ineffective due to a conflict of interest stemming from counsel being paid a flat fee to represent him. He further claims that had there been no conflict of interest, he would not have pleaded guilty and the jury would not have chosen the death penalty.

Counsel were paid $12,000 each for representing Mr. Dorsey regardless of whether the case proceeded to trial or ended in a guilty plea. Mr. Dorsey argues the flat fee arrangement created an incentive for counsel to complete their representation in as little time and with as few expenses as possible. He points to a number of aspects of counsel's representation that he alleges resulted from the conflict of interest, including counsel's failure to investigate the DNA evidence and allegations relating to the rape, failure to hire a mitigation expert, failure to consult with a psychiatrist or Mr. Dorsey's treating physician, and their limitations placed on witness interviews.[19] The motion court found the fee arrangement did not influence counsel's decisions or impact the effectiveness of their representation.

A potential conflict of interest alone is not sufficient to render a guilty plea unknowing, involuntary, or unintelligent. *Krupp v. State*, 356 S.W.3d 142, 147-48 (Mo.

---

[19] Notably, Mr. Dorsey does not allege that counsel ever pressured or coerced him into pleading guilty.

banc 2011). To prevail on a claim that a conflict of interest violates a movant's right to counsel, the movant "must demonstrate that an actual conflict of interest adversely affected counsel's performance." *State v. Roll*, 942 S.W.2d 370, 377 (Mo. banc 1997). No Missouri court has found that a flat fee arrangement creates a conflict of interest, and Mr. Dorsey does not demonstrate an actual conflict that adversely affected counsel's performance.

Funds independent of counsel's flat fee were available if counsel needed to hire an expert or an investigator or if counsel needed other resources. Counsel requested and were authorized to use additional funds for a DNA expert. As previously discussed, counsel's decision not to investigate further the DNA evidence or contest the rape allegation was a result of reasonable trial strategy. Similarly, counsel's mitigation investigation, including investigation into Mr. Dorsey's mental health, has already been discussed and found to be reasonable. Mr. Dorsey points out that Rollin Thompson, the investigator used by counsel, was directed to conduct witness interviews over the telephone. Even so, there is no evidence that any instructions to Mr. Thompson concerning his work on Mr. Dorsey's case were based on finances. While Mr. Slusher could have requested funds to hire an outside investigator, Mr. Slusher asked Mr. Thompson to interview witnesses because he was a salaried investigator for Mr. Slusher's firm. Mr. Thompson was not paid out of the flat fee Mr. Slusher received.

At the evidentiary hearing, counsel testified that they did not make any decision relating to Mr. Dorsey's representation based on their compensation. The motion court found their testimony credible and stated that both attorneys expressed a sincere desire to

39

provide an effective defense. The motion court is in the best position to judge the credibility of counsel. *Taylor v. State*, 262 S.W.3d 231, 243 (Mo. banc 2008). The court did not clearly err in finding there was not an actual conflict of interest giving rise to ineffective assistance of counsel.

## Conclusion

Because Mr. Dorsey's claims relating to the disclosure and investigation of the autosomal DNA profile were not properly raised in his Rule 29.15 motion, they were not preserved for review. Additionally, the motion court did not clearly err in overruling his *Brady* violation claim and ineffective assistance of counsel claims. Accordingly, the motion court's judgment is affirmed.

_____

PATRICIA BRECKENRIDGE, JUDGE

All concur.

40