

# SUPREME COURT OF MISSOURI
## en banc

STATE EX REL. ERNEST JOHNSON, )
                                   )
                   Petitioner, )
                                    )
v.                                     )     No. SC99176
                                    )
PAUL BLAIR, WARDEN OF POTOSI )
CORRECTIONAL CENTER, )
                                    )
                   Respondent. )

**ORIGINAL PROCEEDING IN HABEAS CORPUS**

**PER CURIAM**

## Facts and Procedural History

In February 1994, Ernest Lee Johnson bought a bottle of beer and a package of cigarettes at a Columbia convenience store he frequented.[1] Johnson made a second trip to the convenience store but did not purchase anything. On one of these trips, Johnson questioned the cashier about who would be working the next shift. The cashier responded Mabel Scruggs would relieve her at 5:00 p.m. and the store closed at

---

[1] Many of the facts for this section are taken from *State v. Johnson*, 968 S.W.2d 686 (Mo. banc 1994) (*Johnson I*); *State v. Johnson*, 22 S.W.3d 183 (Mo. banc 2000) (*Johnson II*); *Johnson v. State*, 102 S.W.3d 535 (Mo. banc 2003) (*Johnson III*); *State v. Johnson*, 244 S.W.3d 144 (Mo. banc 2008) (*Johnson IV*); and *Johnson v. State*, 333 S.W.3d 459 (Mo. banc 2011) (*Johnson V*).

11:00 p.m. Johnson left but returned a short time later, staying only a few minutes before leaving again. The cashier noticed Johnson staring at her while she deposited the money from her shift into the store safe. Johnson again did not purchase anything on this trip.

Johnson went to his then-girlfriend's house and purchased a $20 rock of crack cocaine from his girlfriend's son, Rodriguez Grant. Johnson left but returned to buy two more rocks and ask Rodriguez to lend him the .25 caliber pistol Johnson gave him a few weeks prior in exchange for crack cocaine. Rodriguez agreed, and the two test-fired the pistol in the back yard. Johnson returned the gun a while later, claiming it did not work but then retrieved the pistol and left again, wearing layers of clothing, a mask over his face, and black tennis shoes. For around a month, Johnson confided to Rodriguez his plans to hold up the convenience store, locking all but one employee in the back room and having the remaining employee open the safe.

The next time Johnson returned to the house, his face and clothes were spattered with blood. Johnson came in through the back door and went downstairs to Rodriguez's room and gave him back the pistol. Johnson then cleaned his tennis shoes, took off his clothes, put the clothes into a trash bag, and told his girlfriend's other son, Antwane Grant, to get rid of the bag. Johnson had a large amount of money sorted by denomination, and he and Rodriguez counted it. Johnson then hid the money in an air vent. Rodriguez went back upstairs and soon smelled something burning. When Rodriguez returned downstairs, he found Johnson burning paper.

At 1:12 a.m., a deputy sheriff responded to a call to check on the convenience store for the possibility of a disturbance involving weapons. The store lights were still

2

on. Through the windows, the officer saw the cash register was opened and the money vault was out and in the middle of the floor. He observed blood smears on the front door lock. City police officers arrived with keys. Upon entering, they discovered two dead bodies and a .25 caliber shell casing in the bathroom. Another body and another .25 caliber shell casing were found inside the walk-in cooler. The safe was empty.

All three victims were store employees: Mary Bratcher, age 46; Fred Jones, age 58; and Mabel Scruggs, age 57. Each victim died from head injuries consistent with a bloody hammer found at the scene. In addition, Mary Bratcher suffered at least ten stab wounds to her left hand consistent with a bloody flat-head screwdriver found in a field near the store, and Fred Jones suffered a nonfatal, facial gunshot wound. Officers also found a bloody Phillips screwdriver, a pair of gloves, a pair of jeans, and a brown jacket in the field next to the store.

Hair on the gloves was consistent with Mabel Scruggs. Blood on the gloves was consistent with Mabel Scruggs or Fred Jones. Hair on the jacket was consistent with Fred Jones. Blood on the jacket was consistent with a mixture of the blood of all three victims.

On the morning the bodies were discovered, Johnson went to a shopping mall and made over $200 in cash purchases. After he returned to his girlfriend's house, police officers arrived asking for any information about the murders. Johnson initially refused to speak with the officers but eventually agreed to accompany them to the police station. The interviewing officer did not believe Johnson's alibi and read him his *Miranda* rights. Johnson then gave conflicting versions of his alibi and became depressed whenever the

3

convenience store was mentioned. He stated he did not care if the officers shot him. At one point Johnson said, "It took more than one man to do that job."

The police obtained a search warrant for Johnson's girlfriend's house and found a bag containing $443; coin wrappers; partially burned checks, coupons, and a cash register receipt—all bearing the convenience store's name; a live .25 caliber round; and a black pair of tennis shoes with the same company logo as the bloody shoeprints found inside the store.

Officers arrested Johnson. Upon seeing Rodriguez Grant in a holding cell, Johnson stated, "That boy didn't have anything to do with this. None of those boys did." When asked how he knew this information, Johnson responded, "I knew they weren't there."

Antwane Grant led police to the park where he hid, at Johnson's direction, a .25 caliber semi-automatic pistol, 17 live rounds of .25 caliber ammunition, a sweat shirt, a pair of sweat pants, a hooded jacket, two stocking caps, and two pairs of socks. Antwane identified the clothes—and the black tennis shoes found at the house—as those Johnson wore the evening of the murders.

Blood on the sweat shirt was consistent with Fred Jones. Blood on the hooded jacket was consistent with Fred Jones or Mabel Scruggs. Hair on one of the stocking caps was consistent with Fred Jones' and Johnson's hair.

A Boone County jury found Johnson guilty of three counts of first-degree murder and sentenced him to three death sentences. Johnson sought post-conviction relief. This Court affirmed the guilt-phase but set aside his three death sentences. *Johnson I*,

968 S.W.2d at 702. Following a second penalty-phase proceeding, the new jury returned three death sentences. This Court affirmed the death sentences on direct appeal in *Johnson II*, 22 S.W.3d at 194. This Court later set aside those death sentences during Johnson's second post-conviction appeal, remanding the case for a third penalty-phase proceeding because of incomplete evidence of his mental capacity—specifically, his alleged intellectual disability. *See Johnson III,* 102 S.W.3d at 541. Following the third penalty-phase proceeding, the jury found Johnson is not intellectually disabled and again imposed three death sentences. This Court affirmed the death sentences on direct appeal. *See Johnson IV*, 244 S.W.3d at 165.

Johnson filed a Rule 29.15 *pro se* motion for post-conviction relief, and appointed counsel filed an amended motion. *Johnson V*, 333 S.W.3d at 462. The motion court held an evidentiary hearing and received testimony from three mental-health professionals, from Johnson's third penalty-phase attorneys, and from several other witnesses relating to guilt-phase testimony. *Id*. The motion court entered findings and a judgment overruling Johnson's motion. *Id.* This Court affirmed the denial of Johnson's final post-conviction relief motion. *Id*. Johnson then filed for habeas relief in the United States District Court for the Western District of Missouri. The district court denied Johnson's eight claims and denied a certificate of appealability. A panel of the United States Court of Appeals for the Eighth Circuit also unanimously denied a certificate of appealability and rehearing.

The Supreme Court denied a petition for writ of certiorari on October 6, 2014. This Court then issued a warrant of execution and set Johnson's execution date for

5

November 3, 2015. Johnson filed his first petition for writ of habeas corpus in this Court, which this Court denied. Johnson then filed an as-applied challenge to Missouri's method of execution in federal court. The district court dismissed Johnson's complaint, and Johnson moved for a stay of execution. Johnson appealed, but the Eighth Circuit overruled the motion for stay. *Johnson v. Lombardi*, 809 F.3d 388 (8th Cir. 2015). The Supreme Court then granted Johnson's request for a stay of execution. Ultimately, Johnson amended his petition twice in the federal district court, but both times the district court found Johnson's petition failed to state a claim under FRCP 12(b)(6). *See Johnson v. Lombardi*, 2:15-CV-4237-DGK (W.D. Mo. May 1, 2017). After the district court dismissed Johnson's second amended petition, Johnson appealed, and the Eighth Circuit concluded Johnson sufficiently stated a claim. The State petitioned the Supreme Court for a writ of certiorari, which was granted. The Supreme Court subsequently vacated the Eighth Circuit's judgment and remanded the case to the Eighth Circuit for further consideration in light of *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). On remand, the Eighth Circuit determined Johnson had not stated a claim upon which relief could be granted and rejected his request for leave to file a third amended complaint in order to propose a firing squad as a new alternate method of execution. Johnson then petitioned the Supreme Court for writ of certiorari. On May 24, 2021, the Supreme Court denied certiorari. *Johnson v. Precythe*, 141 S. Ct. 1622 (2021) (Sotomayor, J., dissenting). The State then filed a notice of ruling and supplement to the State's second motion to set execution date, renewing its request for this Court to set an execution date.

6

This Court issued its order setting Ernest Johnson's execution date for October 5, 2021. Johnson filed this petition for writ of habeas corpus, alleging (1) he is actually innocent of the death penalty because he is intellectually disabled;[2] (2) the jury instructions on intellectual disability violated Johnson's constitutional rights; and (3) his execution by lethal injection would be cruel and unusual. This Court finds and concludes Johnson is not intellectually disabled. Further, this Court concludes Johnson is not entitled to relief on his remaining claims.[3]

## Standard of Review

A petition for a writ of habeas corpus is the appropriate avenue to raise claims of intellectual disability. *See State ex rel. Strong v. Griffith,* 462 S.W.3d 732, 739 (Mo. banc 2015). A habeas petitioner bears the burden of proof to show he is entitled to habeas corpus relief. *State ex rel. Lyons v. Lombardi*, 303 S.W.3d 523, 526 (Mo. banc 2010). "[H]abeas review does not provide duplicative and unending challenges to the finality of a judgment, so it is not appropriate to review claims already raised on direct appeal or during post-conviction proceedings." *Strong*, 462 S.W.3d at 733-34 (internal quotations omitted).

---

[2] As further explained below, although Johnson frames his claim as one of actual innocence, it rests on the notion he is "actually innocent" of the death penalty because he is intellectually disabled and so his execution would violate the Eighth Amendment—this is, in essence, an *Atkins* claim. In *Atkins*, the Supreme Court held those who are determined to be mentally retarded, now more appropriately referred to as intellectually disabled, are categorically ineligible for a death sentence. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

[3] This Court may deny issuance of a writ of habeas corpus without issuing an accompanying opinion. *See* Rule 84.24. An opinion is issued in this case, however, because an execution date is pending and to demonstrate the careful review and consideration of the merits of Johnson's intellectual disability claim.

However, "[t]here is no absolute procedural bar to . . . seeking habeas relief. Successive *habeas corpus* petitions are, as such, not barred. But the opportunities for such relief are extremely limited. A strong presumption exists . . . against claims that already have once been litigated." *State ex rel. Nixon v. Jaynes*, 63 S.W.3d 210, 217 (Mo. banc 2001).

**<u>Analysis</u>**

**I.      *Johnson Is Not Intellectually Disabled***

Executing intellectually disabled offenders violates the Eighth Amendment's prohibition of cruel and unusual punishment. *See Atkins*, 536 U.S. at 321. The Supreme Court leaves to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [the state's] execution of sentences." *Id*. at 317. "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Hall v. Florida*, 572 U.S. 701, 721 (2014).

The Supreme Court has indicated the Diagnostic and Statistical Manual of Mental Disorders 5th edition (DSM-5) embodies "current medical diagnostic standards" for determining intellectual disability. *Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017) (*Moore I*). The DSM- 5 refines the long-used three-pronged approach to intellectual disability. DSM-5 at 37. The three criteria are: (A) deficits in intellectual functions; (B) deficits in adaptive functioning in comparison to an individual's age, gender, and socioculturally matched peers; and (C) onset during the developmental period. *Id*. This Court likewise

8

recognizes the DSM-5 as the proper framework with which to analyze intellectual

disability.

Congruent with the DSM-5 and prevailing medical standards, § 565.030.6[4] defines

"intellectual disability" as:

> [A] condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

This Court already considered Johnson's intellectual disability claim in his 2015 petition

for habeas corpus and denied relief. Johnson now requests this Court consider his claim

again in light of *Moore I* and *Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*). These

cases do not provide cause for a different outcome as demonstrated by the analysis set out

below.

Because Johnson's "petition for writ of habeas corpus is an original proceeding in this

Court, pursuant to Rules 84.22 and 91.01, this Court is the factfinder."[5] *State ex rel. Cole*

*v. Griffith*, 460 S.W.3d 349, 358 (Mo. banc 2015). As such, this Court considers

Johnson's argument and evidence.

### A. Intellectual Functioning

Intellectual functioning is typically measured with individually administered and

psychometrically valid tests of intelligence. DSM-5 at 37.

---

[4] All statutory references are to RSMo 2016, unless noted otherwise.
[5] While this Court may appoint a special master pursuant to Rule 8.03, the circumstances of this case do not require the appointment of a special master.

> Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +/- 5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 +/- 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

*Id*. While an IQ score of 65 to 75 may indicate intellectual disability, there is no strict IQ score cutoff. *See Hall*, 572 U.S. at 712. Instead, "an individual with an IQ test score 'between 70 and 75 or lower,' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning." *Id*. at 722. (internal citation omitted) (quoting *Atkins*, 536 U.S. at 309 n.5). Additionally, practice effects and the "Flynn effect" may affect test scores.[6]

"IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM-5 at 37. For this reason, the DSM-5 emphasizes evaluation of a person's broader intellectual functions in determining intelligence, i.e., reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience. *Id.* In adults, this presents as impairments in abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (e.g., reading, money management). *Id.*

---

[6] DSM-5 at 37. The "Flynn effect" results in overly high scores due to out-of-date test norms.

10

Johnson has taken several IQ tests in his life, obtaining the following scores prior to the murders: 77 in 1968;[7] 63 in 1972; 95 in 1979;[8] 78 in 1994; and 84 in 1995. Since the murders, Johnson obtained scores of: 67 in 2003; 67 in 2004; 70 in 2008; 71 in 2009; and 70 in 2019. Multiple of Johnson's scores place him above the range of intellectual disability. This fact alone, however, does not invalidate or dismiss his lower scores. Before the murders, Johnson obtained only one score (out of four valid scores) that would indicate significant subaverage intelligence. Dr. Heisler, an expert for the State, believed Johnson was malingering during his 2004 IQ test, and the fact that Johnson's scores decline markedly after the murders supports that conclusion.

Regardless of whether Johnson has been malingering during his recent IQ tests, his test scores are not dispositive because they, as adjusted for margin of error and the Flynn effect, are within the range that could be indicative of intellectual disability. The additional, broader intelligence factors set forth in the DSM-5, however, illustrate Johnson does not possess such substantial deficits in intellectual functioning to prove intellectual disability. Most glaring is Johnson's ability to plan, exemplified by the details of his murders. During an interview with Dr. Heisler 10 years after the murders, Johnson was able to recall specific, strategic decisions he made and the reasons for them. For example, Johnson planned for at least a month to rob the convenience store; decided

---

[7] In his petition for habeas corpus, Johnson states he scored 72 in 1968. This Court has already considered this discrepancy and stated Johnson obtained a score of 77. *See Johnson IV*, 244 S.W.3d at 152.

[8] The department of corrections administered this test while Johnson was incarcerated. Its results are likely not valid because it was given in a group setting. *See* DSM-5 at 37. Accordingly, this Court does not consider this test result and only lists it for completeness.

to rob the Casey's because he needed more money to purchase cocaine; visited the store several times the day of the murders to gain information regarding who would be on duty; wore two layers of clothing so he could remove the top layer after the robbery because he knew witnesses may give a description of his clothing; wore a mask to conceal his identity; and, subsequent to the murders, instructed his then-girlfriend's son to hide evidence, including a pistol, ammunition, and the clothes Johnson wore the evening of the murders, which contained physical evidence. *Johnson I*, 968 S.W.2d at 689.

These facts illustrate Johnson's ability to plan, strategize, and problem solve—contrary to a finding of substantial subaverage intelligence. Dr. Keyes, one of Johnson's experts, even admitted Johnson took logical, precise, intelligent steps to prepare, execute, and avoid apprehension for the murders, and these behaviors indicated Johnson was very goal-oriented in carrying out his plan. *Johnson IV*, 244 S.W.3d at 154. As the Supreme Court recognized in *Atkins*, "There is no evidence that [persons with intellectual disability] are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." 536 U.S. at 318.

In sum, Johnson's IQ scores are not dispositive of intellectual disability, but his ability to plan, reason, strategize, and set goals prove Johnson does not possess significantly subaverage intelligence as would indicate intellectual disability. Even so, this Court will also assess Johnson's adaptive functioning.

### B. Adaptive Functioning

"Deficits in adaptive functioning" refers to "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." DSM-5 at 37. Various adaptive behaviors, such as communication, functional academics, and self-direction, fall into three domains of adaptive functioning: conceptual, social, or practical. *Id*. This criterion is met when "at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." *Id*. Importantly, and critical to Johnson's claim, "[t]o meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the [person's] intellectual impairments[.]" *Id*. In essence, adaptive deficits must be caused by impaired intellectual functioning.[9]

Johnson asserts he possesses continual, extensive deficits in four adaptive behaviors: functional academics, home living, communication, and self-direction. Dr. Martell's report asserts these alleged deficits render Johnson severely impaired in all

---

[9] Actual deficits in adaptive functions are not *per se* evidence of intellectual disability. *See* DSM-5 at 37. There are many aspects of Johnson's life that could, absent intellectual disability, account for any alleged deficit in adaptive behaviors; namely his addiction to cocaine, inconsistent upbringing, poor education, and abusive childhood to name a few. This Court is sensitive to the fact that these possible alternative explanations are sometimes in and of themselves effects of intellectual disability, and it is not Johnson's burden to prove any deficit is not caused by some other factor. *See Moore I*, 137 S. Ct. at 1051; *see also* DSM-5 at 37. Johnson must, however, provide enough evidence to prove the alleged deficits are related to his alleged deficits in intellectual functioning. *See* DSM-5 at 38. On the whole, Johnson fails to do this.

the three diagnostic domains.  In analyzing Johnson's evidence, this Court is cognizant of the Supreme Court's instruction in both *Moore I* and *Moore II* to not over-emphasize or over-rely upon adaptive strengths as opposed to adaptive deficits.  Johnson's arguments regarding his alleged deficits in adaptive behaviors are largely not credible, and suffer from a lack of causal connection to his alleged impaired intellectual functioning.

This Court finds Johnson's evidence does not prove he possesses deficits in adaptive function and, for that reason, Johnson is not sufficiently impaired in any of the three domains of adaptive functioning outlined in the DSM-5.

### i.       Johnson's Evidence

In support of his intellectual disability claim, Johnson presents several experts' reports and seven affidavits.  Six of the seven affidavits are written by attorneys involved with Johnson's defense and regard Johnson's mental ability at trial and ability to participate in his defense.  The attorneys' relationship with Johnson raises strong concerns of bias and are otherwise not persuasive. In the remaining affidavit, a juror from Johnson's 2006 penalty-phase trial details his reasoning for finding Johnson not to be intellectually disabled.  Johnson attacks this juror's reasoning, but nothing in the affidavit is germane to the determination of whether Johnson is intellectually disabled.

The only expert reports not previously considered by this Court in Johnson's 2015 petition for a writ of habeas corpus are those of Dr. Martell and Dr. Adler.[10]  Dr. Martell based his report on previous reports of Johnson's experts and recently performed

---

[10] This Court did consider Dr. Adler's 2008 report in Johnson's 2015 petition for habeas corpus. Dr. Adler's new report is substantially the same.

14

cognitive tests. This Court has already considered the reports Dr. Martell relied upon and found them not persuasive. This Court is likewise not persuaded by Dr. Adler's recent testing because of Johnson's incentive to produce results indicating intellectual disability. Moreover, as § 565.030.6 states, "intellectual disability" is "a condition . . . manifested and documented before eighteen years of age." Because Johnson is now over 60 years old, reports of Johnson's alleged current mental ability are not given much weight.

Dr. Adler's report is also not persuasive. Dr. Adler administered Quantitative Electroencephalograms ("QEEG") to Johnson in 2008 and in 2020. QEEG measures the brain's electrical activity. Dr. Adler determined Johnson's QEEG is indicative of Fetal Alcohol Spectrum Disorder ("FASD"). Importantly, though FASD may sometimes cause intellectual disability, Dr. Adler does not make a finding as to whether Johnson is intellectually disabled. Dr. Adler's report is, thus, not persuasive on the question of whether Johnson is intellectually disabled.

### ii. Adaptive Behaviors

#### a. Functional Academics

Johnson largely relies on his poor academic performance to prove his alleged deficit in functional academics. Namely, Johnson states he was in a developmental reading class in the ninth grade, took special education classes, was placed on the "basic track" in ninth grade for "slower-ability" children, received poor grades, missed school often, has between a second and third grade reading level, and had to repeat the ninth grade before ultimately dropping out of school.

15

As this Court noted in *Johnson IV*, there is no evidence the "special education" classes for "slower-ability" children were classes meant for students with intellectual disability—and Johnson does not assert as much. 244 S.W.3d at 155. Johnson also does not provide any evidence of a formal evaluation or diagnosis of intellectual disability during the developmental period. While Johnson's records do indicate poor grades, they do not meet the legal definition of intellectual disability.

Even if Johnson were to have proved a deficit in functional academics, he does not attempt to connect the alleged deficit with diminished intellectual functioning. Instead, Johnson merely asserts, "there is no evidence that would support any other conclusion regarding this adaptive function." But, there are multiple factors present in Johnson's life that could, absent intellectual disability, prevent academic achievement. Again, Johnson is not required to prove his poor academic performance is not caused by some independent factor, but this Court finds Johnson failed to prove a causal connection between his poor academic performance and his alleged intellectual impairment.

### b. Home Living

Johnson asserts he has lived with women who cared for him like his grandmother and former girlfriends. *Id.* at 154. These women state Johnson did not have any duties around the house and could not cook, drive, or do laundry "the right way." Johnson has also had significant trouble maintaining even menial employment. As previously considered, this testimony was from Johnson's friends and family members who knew Johnson would not be sentenced to death if it was determined he was intellectually

16

disabled. *Id*. Moreover, even taken as accurate, this testimony does not demonstrate Johnson requires ongoing support to function in daily life.

Contrary to this testimony, Johnson's probation officer testified he was capable of working and that he had worked before but did not hold a job very long because he was not motivated to work. *Id*. Even Dr. Keyes believed Johnson was not motivated to work. *Id*. Thus, this Court is not persuaded the facts demonstrate such extensive deficits—if any deficiency at all—to indicate intellectual disability. Johnson again does not demonstrate a causal connection between these facts and his alleged intellectual impairment.

### c. Communication

Johnson asserts his ability to communicate has been "severely compromised since he was [a] child." A conclusion, however, that Johnson possesses such significant deficits in communication to prove intellectual disability is contrary to the evidence. In support, Johnson notes he "stayed close and 'up underneath' his grandmother" as a child; his grandmother called him "special"; Johnson interacted with younger children; was placed in special education classes and was "slow" in school; and others teased him and called him "slow," "dummy," "crazy," and "stupid."

Johnson also presents the following evidence from his experts: Johnson's ability to communicate orally is "fair"; his ability to read and write is "significantly impaired"; Johnson reads at a third-grade level; Johnson's spelling is poor and his punctuation and grammar are very poor"; and Johnson tested at the four-and-a-half-year-old age level on the Vineland Adaptive Behavior Scale. Notably, Johnson's own expert, Dr. Smith

17

testified Johnson has a very concrete understanding of verbal communication, but has difficulty with written communication. Johnson has failed to demonstrate he requires ongoing support in order to communicate with others in daily life.

In addition, there is reliable, contradictory evidence from several witnesses that Johnson is able to communicate effectively with others: Johnson wrote back and forth with his ex-girlfriend frequently while in prison; was able to communicate with the officers who interviewed him during the initial murder investigation and understood the officer's questions; was able to communicate with his probation officer; and had no problem communicating or making purchases when he came into the Casey's prior to the murders.

The most revealing piece of evidence contradicting deficits in communication is Dr. Heisler's video-recorded interview with Johnson. In the video, which the State played at trial, Johnson communicated effectively with Dr. Heisler for over an hour and was able to relay information regarding his reasoning and strategies for the murders 10 years after the fact.[11]

### d. Self-Direction

The bulk of Johnson's evidence regarding self-direction revolves around his "inability to conform his actions to the law." There is no doubt Johnson has, even before the murders, not conformed his actions to the law. Criminal behavior, absent a causal

---

[11] This Court acknowledges strengths in adaptive behaviors such as communication may increase in controlled environments like prison and notes it is not solely relying on Johnson's behavior in prison.

connection to intellectual impairment, however, does not support intellectual disability. In his petition, Johnson himself acknowledges he "has been charged and convicted of various offenses—most of them property-related and **indicative of a drug addiction**." It is extremely telling that the only cause Johnson mentions for not conforming his actions to the law is his drug addiction—not intellectual impairment.

Moreover, the fact that Johnson has a lengthy criminal history does not establish a deficit in self-direction. Johnson's expert, Dr. Keyes, noted Johnson is goal-oriented—contrary to a finding that Johnson lacks self-direction. Additionally, the premeditated and strategic nature of the murders, along with Johnson's forethought in evading apprehension indicate Johnson does not have a deficit in self-direction. Johnson's parole officer also testified he was able to seek out help for his ongoing substance abuse and even asked to be placed in protective custody to avoid retaliation for a drug debt he owed another prisoner. *Id*. at 155.

## II. No Instructional Error

Johnson further argues (1) the sentencing court erred in instructing the jury Johnson had the burden to prove he is intellectually disabled, and (2) the jury instructions misled the jury into believing they must have unanimously found Johnson to be intellectually disabled before they could individually consider intellectual disability as a mitigating factor. This Court already considered and rejected Johnson's first claim in *Johnson IV* and need not consider it again.[12] *See Strong*, 462 S.W.3d at 733-34.

---

[12] In *Johnson IV*, this Court held:

Johnson's second claim of instructional error is procedurally barred because he did not raise it at trial, on direct appeal, or during post-conviction relief proceedings. *Strong*, 462 S.W.3d at 738-39. Johnson seeks to overcome this procedural bar through both a freestanding and gateway claim that he is actually innocent of the death penalty because he is intellectually disabled.

While Johnson could properly raise a claim of actual innocence because he is sentenced to death, *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 547 (Mo. banc 2003), his specific claim that he is actually innocent because he is intellectually disabled is not cognizable. In *Sawyer v. Whitley*, the Supreme Court held a court may reach a procedurally barred claim when an offender shows, by clear and convincing evidence, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law. 505 U.S. 333, 347-48 (1992). The Supreme Court clarified, and this Court has reiterated, however, actual innocence of the death penalty only means the defendant can prove they are either innocent of the actual underlying crime or aggravating factors. *Id*. at 340-41; *see also Clay v. Dormire*, 37 S.W.3d 214, 218 (Mo.

---

Johnson's claim is without merit. Under section 565.030.4(1), a finding of [intellectual disability] is made by the jury and, if such a finding is made, the potential punishment for a capital defendant is limited to life imprisonment. Determining a defendant is [intellectually disabled] is not a finding of fact that increases the potential range of punishment; it is a finding that removes the defendant from consideration of the death penalty. The Supreme Court's holding in *Ring* requiring a jury to find statutory aggravating circumstances beyond a reasonable doubt does not apply to the issue of [intellectual disability]. The instruction the trial court submitted to the jury, MAI–CR 3d 313.38, is not in conflict with substantive law or *Ring*. The court did not err in instructing the jury that Johnson had the burden of proving [intellectual disability] by a preponderance of the evidence.

*Johnson IV*, 244 S.W.3d at 151.

banc 2000); *see also State ex rel. Koster v. McElwain*, 340 S.W.3d 221, 258 (Mo. App. 2011).

Intellectual disability is neither an element of the underlying crime nor an aggravating factor. Rather, intellectual disability concerns whether an offender is ***eligible*** for the death penalty. *See Atkins,* 536 U.S. at 320. Johnson's second claim has been previously litigated and decided against him and, even if that was not the case, it would be procedurally barred because it could have been previously litigated.

### III.  Method of Execution

Johnson also argues Missouri's lethal injection protocol, as applied to him, would constitute cruel and unusual punishment in violation of article I, § 21 of the Missouri Constitution.[13] The basic facts underlying Johnson's claim are as follows. Doctors diagnosed Johnson with an atypical parasagittal meningioma brain tumor in 2008. Doctors performed a craniotomy on Johnson to remove the tumor but were unable to remove it entirely. As a result of the surgery, Johnson has scarring on his brain and is missing a portion of his brain matter responsible for the movement of and sensation in the legs. Johnson alleges these brain defects interrupt his electrical brain activity that

---

[13] The State argues Johnson's method of execution claim is properly brought in a declaratory judgment action, not habeas. This Court has recognized that habeas corpus is the proper remedy when a prisoner seeks to vacate his or her sentence. *Hicklin v. Schmitt*, 613 S.W.3d 780, 787 (Mo. banc 2020). Of course, Johnson's method of execution claim, if successful, would not vacate his death sentence, but would merely change how the state would carry out his sentence. Therefore, as *Hicklin* suggests, Johnson's method of execution claim is more appropriately brought in a declaratory judgment action. *See also Hill v. McDonough*, 547 U.S. 573, 579-80 (2006) (holding a method of execution claim must be brought under § 1983, not in habeas). However, as a practical matter, death-sentenced defendants have raised method of execution claims along with other habeas corpus claims and been permitted review of such claims.

21

manifests as violent and uncontrollable seizures. Johnson also alleges doctors have diagnosed him with epilepsy since the craniotomy. In sum, Johnson argues Pentobarbital, the drug used in Missouri's lethal injection protocol, when coupled with his preexisting brain defects, will trigger painful seizures during his execution.

Both the Missouri and United States constitutions prohibit cruel and unusual punishment. Mo. Const. art. I, § 21; U.S. Const. amend. VIII. In order to succeed on his method-of-execution claim, Johnson must plead and prove two elements. First, Johnson must establish the State's chosen method of execution "**presents a risk that is '*sure or very likely* to cause serious illness and needless suffering,' and [would] give rise to sufficiently *imminent* dangers**." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (emphasis added). "[T]here must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Id.* (internal quotation marks omitted).

Second, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125. In showing an alternative method of execution is feasible and readily implemented, "the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Id.* at 1129 (internal quotation marks omitted). It is not enough for the prisoner to show the alternative method of execution is "slightly or marginally safer." *Glossip*, 576 U.S. at

22

877. What is more, the Eighth Amendment does not require states to adopt "untried and untested" methods of execution. *Bucklew*, 139 S. Ct. at 1130.

### a. *No Substantial and Unjustifiable Risk*

To prove the first element, Johnson argues the administration of Pentobarbital "creates a substantial and unjustifiable risk that violent and uncontrollable seizures could be triggered during the execution due to [Pentobarbital's] interaction with [his] remaining [tumor], scarring tissue, and brain defect." In support of his conclusion, Johnson exclusively relies on Dr. Joel Zivot's affidavit. The salient portion of Dr. Zivot's affidavit is as follows:

> As a result of Mr. Johnson's brain tumor, brain defect, and brain scar, a substantial risk of serious harm will occur during his execution as a result of a violent seizure that is induced by Pentobarbital injection. Generalized seizures, such as the one that would occur in Mr. Johnson, are severely painful. . . . As seizures are known to be painful and are observed as such by others, Pentobarbital induced seizures will be more painful than seizures from other causes including those that would otherwise occur in Mr. Johnson as a result of his underlying epilepsy. . . . It is erroneous to dismiss the risk of Pentobarbital induced seizures in the case of Ernest Johnson by claiming that Mr. Johnson may have a seizure at the time of his execution as a function of a baseline seizure disorder. The Missouri execution protocol will increase the likelihood of a seizure with a very high degree of probability. . . . I am of the opinion that Mr. Johnson faces a significant medical risk for a serious seizure as the direct result of the combination of the Missouri lethal injection protocol and Mr. Johnson's permanent and disabling neurologic disease.

This affidavit concludes Johnson faces an increased risk of seizure during his execution due to Pentobarbital. However, the analysis underlying Dr. Zivot's conclusion does not prove a seizure is "sure or very likely" to occur during Johnson's execution because the affidavit does not prove a causal connection between Pentobarbital and an increased possibility of seizure. *Glossip*, 576 U.S. at 877. Instead, Dr. Zivot rests his

23

conclusions on an analysis of a different barbiturate—Methohexital.  Methohexital, which is structurally related to Pentobarbital, is used to intensify and prolong seizures during electroconvulsive therapy (ECT).[14]  Dr. Zivot reasons that, because Pentobarbital is also a barbiturate and is structurally related to Methohexital, it too is a "seizure-promoting compound" that creates a risk Johnson will suffer a painful seizure during his execution.[15]

Notably, the affidavit fails to show how the effects of Pentobarbital and Methohexital are similar or how Pentobarbital will cause a similar reaction when administered during Johnson's execution.  This is crucial because, as the affidavit notes, "Barbiturates are a large group of drugs with a wide spectrum of action . . . [that produce] differing effects on the central nervous system."  Without an adequate comparison of the effects of Methohexital with the effects of Pentobarbital, Dr. Zivot's conclusion regarding Methohexital cannot be imputed to Pentobarbital.  Furthermore, Dr. Zivot does not note how much Methohexital is used to exacerbate an ECT seizure and how that unknown amount compares to the 5-10 grams of Pentobarbital used in Missouri's lethal execution protocol.  This Court finds Dr. Zivot's affidavit, standing alone, is not

---

[14] ECT is "a form of treatment of mental disorders in which convulsions are produced by the passage of an electric current through the brain."  *Stedman's Medical Dictionary* 913440.

[15] It should be noted that Dr. Zivot has been retained by several death-sentenced inmates to provide expert testimony supporting a method-of-execution claim.  Courts have routinely rejected Dr. Zivot's opinions.  *See Bucklew*, 139 S. Ct. at 1131-33; *Williams v. Kelley*, 854 F.3d 998, 1001 (8th Cir. 2017); *Johnson v. Lombardi*, 809 F.3d 388, 391 (8th Cir. 2015).

24

sufficient proof that Johnson is sure or very likely to suffer a painful seizure during his execution.[16]

### b. *Feasible and Readily Implementable Alternative*

Further, Johnson has not pleaded and proved "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S.Ct. at 1125. Johnson's only mention of a feasible and readily implementable alternative method of execution is the following paragraph near the end of his writ petition:

> Because Missouri does not require Mr. Johnson to plead an alternative method of execution, the Eighth Circuit's finding that he had plead [sic] a plausible claim should also hold true in this court. To the extent this Court would require Mr. Johnson to plead an alternative method of execution, Mr. Johnson alleges that execution by firing squad is an acceptable alternative method. To the extent that requiring an alternative method would be a new pleading requirement, Mr. Johnson would request an opportunity to address that issue further.

It is unclear what Johnson suggests by "Missouri does not require [him] to plead an alternative method of execution[.]" *Bucklew* and *Glossip*, among other cases, make clear that Johnson must show "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain" to prevail on his method-of-execution claim. *See Bucklew*, 139 S. Ct. at 1125 (stating the two-element

---

[16] In addition to the flaws in Dr. Zivot's reasoning, this Court is also cognizant of Dr. Zivot's similar conclusion that Russell Bucklew was "likely to experience prolonged feelings of suffocation and excruciating pain" during his execution. *Bucklew*, 139 S.Ct. at 1131. Further impugning Dr. Zivot's credibility, the witnesses present at Bucklew's eventual execution stated Bucklew showed no signs of pain or discomfort.

25

test set forth in *Glossip* "governs all Eighth Amendment method-of-execution claims" (internal quotation marks omitted)). Although not addressed in his writ petition, it is possible that Johnson rationalizes, because he is only raising a claim under article I, § 21 of the Missouri Constitution and not the Eighth Amendment, that he is exempt from pleading and proving what *Bucklew* and *Glossip* require. That rationalization has no basis in precedent. "The Eighth Amendment and article I, § 21 of the Missouri Constitution provide the same protection against cruel and unusual punishment." *State v. Wood*, 580 S.W.3d 566, 588 (Mo. banc 2019). As such, this Court applies the same standard no matter if the prisoner alleges his eventual execution will violate the Eighth Amendment and/or article I, § 21 of the Missouri Constitution. *State v. Nathan*, 522 S.W.3d 881, 882 n.2 (Mo. banc 2017). Additionally, a petition for a writ of habeas corpus is a civil action subject to the rules of civil procedure. *Nixon*, 63 S.W.3d at 216. Because Missouri is a fact pleading state, Johnson's petition must set forth facts showing he is entitled to habeas relief. *Id.*

Johnson's mention of a firing squad as an alternative method of execution fails to provide sufficient detail[17] to permit a finding that the State could carry out an execution

---

[17] In *Bucklew*, the Supreme Court gave some guidance as to what "sufficient detail" means in regards to an allegation of nitrogen-induced hypoxia as an alternative method of execution:

> Mr. Bucklew's bare-bones proposal falls well short of that standard. He has presented no evidence on essential questions like how nitrogen gas should be administered (using a gas chamber, a tent, a hood, a mask, or some other delivery device); in what concentration (pure nitrogen or some mixture of gases); how quickly and for how long it should be introduced; or how the State might ensure the safety of the execution team, including protecting them against the risk of gas leaks.

139 S. Ct. at 1129.

via firing squad relatively easily and reasonably quickly. *Bucklew*, 139 S. Ct. at 1125.

Rather than provide the requisite proposal, Johnson, in his Reply to Answer, belatedly

attaches the Utah Department of Corrections' firing squad protocol as an exhibit. This

Court normally would not consider the exhibit because a Reply to Answer exists only to

"clarify the facts and issues in a habeas corpus proceeding," not to include matters

omitted from the writ petition. *State ex rel. Singh v. Purkett*, 824 S.W.2d 911, 912 n.1

(Mo. banc 1992); Rule 91.12. Nevertheless, Johnson neither asks this Court to adopt

Utah's protocol in full nor identifies the portions of Utah's protocol he proposes as an

alternative method of execution. This Court determines Johnson's inclusion of Utah's

protocol, without more, does not provide the "sufficient detail" required by *Bucklew* or

this Court's fact pleading requirements.

In addition, Johnson's "proposal" does not sufficiently allege death by firing squad

"would significantly reduce a substantial risk of severe pain"[18] or that Missouri "has

refused to adopt [a firing squad] without a legitimate penological reason."[19] *Bucklew*,

139 S. Ct. at 1125. The failure to plead and prove either one of these requirements is

---

[18] In his Reply to Answer, Johnson concludes, without any analysis or support, that "a firing squad will significantly reduce his risk of pain since his seizure condition is obviously not implicated if he is shot to death[.]" This Court need not consider conclusory allegations made in a petition for a writ of habeas corpus. *Tucker v. Kaiser*, 176 S.W.2d 622, 623 (Mo. banc 1944).

[19] In its suggestions in opposition to Johnson's writ petition, the State argues it would have legitimate penological reasons to refuse to adopt firing squad as an execution method, namely: (1) Missouri's lethal injection protocol has a track record of rapid and painless death; (2) execution by firing squad would jeopardize the safety and the security of the department of corrections and its personnel; and (3) death by firing squad would tarnish the dignity of Missouri's execution procedures.

fatal to Johnson's method of execution claim. Nevertheless, Johnson has failed to plead and prove both; therefore, his method of execution claim fails.[20]

This Court finds and concludes Johnson has failed to prove he is intellectually disabled; therefore, he is eligible for the death penalty. Additionally, this Court finds and concludes Johnson is not entitled to relief on any of his remaining claims. This petition for a writ of habeas corpus is denied.[21]

All concur.

---

[20] Even if Johnson could plead and prove his method of execution claim, Missouri would not be required to adopt firing squad as an alternative method of execution because it is "untried and untested." *Bucklew*, 139 S. Ct. at 1130. Only four states allow firing squad as an alternative method of execution; Mississippi, Oklahoma, Utah, and South Carolina. *See Methods of Execution,* Death Penalty Information Center*,* https://deathpenaltyinfo.org/executions/methods-of-execution. Furthermore, only three executions have been carried out by firing squad since 1976, and only Utah has used a firing squad since the 1920s. *See Facts about the Death Penalty,* Death Penalty Information Center, https://documents.deathpenaltyinfo.org/pdf/FactSheet.pdf; *see also McGehee v. Hutchinson*, 854 F.3d 488, 494 (8th Cir. 2017) (explaining a firing squad may not be a tried and tested alternative because "The firing squad has been used by only one State since the 1920s. It requires trained marksmen who are willing to participate and is allegedly painless only if volleys are targeted precisely"). Neither the Eighth Amendment nor article I, § 21 of the Missouri Constitution would require the State to implement such a seldom-used and risky method of execution, especially when Missouri's lethal injection protocol has proved successful in achieving rapid and painless death for condemned inmates.

[21] On July 12, 2021, Johnson filed a motion for stay of execution with this Court. That motion is contemporaneously overruled.